UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

JOSHUA MUZUMALA,

                              Plaintiff,

                    -against-

1) Unknown federal agents
2) John Doe 1
3) John Doe 2                                           Case No.
4) John Doe 3
5) John Doe 4                                         **COMPLAINT**
6) John Doe 5
7) John Doe 6
8) Jane Doe 1
9) University of New Orleans
10) Neal Maroney
11) Susan Brady

                                 Defendants.

-------------------------------------------------------------------- X

## I.      <u>NATURE OF THIS ACTION</u>

**1)**       This is an action brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), 42 U.S.C §§ 1981, 1983, 1985, and1986, and pursuant to statutory and common laws for the States of Louisiana, and New York.

**2)**       Plaintiff seeks injunctive and declaratory relief, compensatory damages, punitive damages, liquidated damages, and reasonable litigation expenses as remedies for Defendants' violations of Plaintiff's Constitutional, Federal, and State statutory as well as common law rights.

## II.    JURISDICTION AND VENUE

**3)**    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331.

**4)**    This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiff's State law claims share all common operative facts with his Federal law claims.

**5)**    Additionally, this Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. And other forms of relief such as reasonable legal expenses pursuant to 42 U.S.C. § 1988

**6)**    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this complaint occurred in this district. Additionally, venue is proper in this Court pursuant to 28 U.S.C. §1391(e).

## III.    JURY TRIAL

**7)**    Pursuant to 28 U.S.C. §1861, Plaintiff demands trial by jury on all counts permitted by the laws.

## IV.    PARTIES

**Plaintiff: Joshua Muzumala**

**8)**    Is a male of African descent and a resident of New York State who moved to the United States in the year 2006. Plaintiff having spent much of his upbringing in a developing country had looked to the United States as a beacon of hope; and in the words of John Winthrop, that shining "City upon a hill." Plaintiff having always known his strengths in education, set his sight on attaining an American education, and by so doing believed he chose to aspire to something higher, with his ultimate goal set on doing a PhD in economics, for his own benefit,

for the benefit of the United States, and for the benefit of the country where he comes from. Plaintiff has been able to attain a bachelor's degree in accounting, a master's degree in accounting, became a certified public accountant in 2017, and with only three classes left to do, on track to completing a second bachelor's degree in economics. Plaintiff asserts that he has had to overcome overwhelming challenges to accomplish this, and stayed the course, no matter how tough things got – always striving to improve and do better with every failure and success alike. As an academic, Plaintiff has a strong sense of responsibility and moral duty to use his knowledge, skills, and experiences to help lift others up, who might need a hand. Plaintiff plans to spend the rest of his life in academia to help build economic systems that accomplish the goal of lifting people out of poverty and putting them onto a path to generational economic independence. Plaintiff believes that he has the best opportunities to achieve this, right here in the United States.

9)    On September 6, 2019, Plaintiff moved to New Paltz, New York, at New Paltz Gardens Apartment 5C, New Paltz, NY 12561, to be close to campus at the State University of New York at New Paltz (SUNY New Paltz) where he had been accepted for a second bachelor's degree in economics.

10)    While living at New Paltz Gardens Apartments, Plaintiff experienced xenophobia and racial animus directed at him from a Couple, John Doe 2 and Jane Doe 1, who at the time relevant to this complaint, lived in the same building. During the ongoing bias incidents, Plaintiff requested to be released from his lease (Exhibit 1). Upon information, Plaintiff was told that he would not be released from his lease but instead would be assigned a different apartment unit in a different building.

11)     For 7 months, starting September 2019 to April 2020, Plaintiff experienced xenophobia and racial animus from Defendants John Doe 2, and Jane Doe 1. Plaintiff accepted the different apartment unit and on April 18, 2020, Plaintiff moved into New Paltz Gardens, Apartment 11F, New Paltz, NY 12561. However, for reasons unknown to Plaintiff, the bias incidents continued at the new apartment unit; perpetuated by Defendants John Doe 2, and Jane Doe 1. Defendants John Doe 2, and Jane Doe 1 influenced residents around Plaintiff's new apartment building and organized proxies to perpetuate the harassment of Plaintiff.

12)     Starting around late-April 2020, Plaintiff asserts that the harassment had started including intimations that Plaintiff would be deported. Plaintiff alleges having reasonable cause to believe that Defendants John Doe 2, and Jane Doe 1 involved Defendants John Doe 1, and Unknown federal agents for the purposes of interfering with Plaintiff's petition for permanent residence. Plaintiff asserts that the involvement of Defendants John Doe 1 and Unknown federal agents would mark the beginning of a protracted and horrific experience for Plaintiff involving intentional violations of Plaintiff's civil rights and Constitutional liberties, for the purposes of intimidating Plaintiff to leave the United States.

13)     During this time, April 2020, Plaintiff's immigration petition for permanent residence was being processed by the United States Citizenship and Immigration Services (USCIS).

14)     Plaintiff alleges that with the involvement of Defendants John Doe 1, and Unknown federal agents, the xenophobia and verbal harassment directed toward Plaintiff substantially escalated, between the period April 2020 to September 2020.

15)     On September 15, 2020, Plaintiff moved to a different town, at 20 N Bridge St, Apt 22A, Poughkeepsie, NY 12601, hoping that the harassment from Plaintiff's previous residential

community was deciduous, and that it would stop when Plaintiff moved away to a different town.

16) Defendants John Doe 1 and Unknown federal agents, acting under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies, tracked and followed Plaintiff at his new apartment in Poughkeepsie NY. Defendants got access to apartments adjacent to Plaintiff's apartment, and from there would surveil Plaintiff, including, but not limited to casting aspersions about Plaintiff, and alleging that Plaintiff was a criminal and was getting deported.

17) On 12/30/2020, Plaintiff moved out of his apartment in Poughkeepsie NY and decided to move back to Brooklyn NY.

18) Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1 and their proxies, tracked and followed Plaintiff all the way to Brooklyn NY, and gained access in the building where Plaintiff was. At one point, using the loud speaker from an unmarked police car saying, "you cannot hide from us." Intimating at the suggestion that Defendants had truly believed Plaintiff was getting deported, such that Plaintiff moving to avoid the harassment and bias incidents was, in their minds, Plaintiff trying to escape deportation.

19) On May 21, 2021, Plaintiff's petition for permanent residence was approved by USCIS. Plaintiff asserts that when Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1 and their proxies, found out about the approval, Plaintiff alleges hearing Defendant Jane Doe 1 say "**we keep doing this until we run him out of the country**."

20) With the approval of Plaintiff's petition for permanent residence, Plaintiff decided to move to New Orleans, Louisiana where he was accepted into the Financial Economics PhD program at the University of New Orleans (UNO). This time around, Plaintiff hoped that the distance

(from New York to Louisiana), coupled with the fact that Plaintiff had been granted the amazing privilege of residing permanently in the United States, would discourage Defendants from tracking, following, and harassing Plaintiff.

21) Plaintiff alleges that Defendants exhibited an excessive obsession with harassing and intimidating Plaintiff, in order to try to run Plaintiff out of the country when they, under color of law, tracked and followed Plaintiff all the way to Louisiana from New York, and there repeatedly engaged in a course of conduct that would severely demonize, and defame Plaintiff, including subjecting Plaintiff to cruel, unusual and inhumane methods of enforcement that would cause Plaintiff to have reasonable fear of physical injury, serious physical injury, or death.

22) While at the University of New Orleans, surveillance and harassment of Plaintiff substantially escalated to include what Plaintiff believes was the use of through-the-wall x-ray surveillance to intrude into Plaintiff's privacy. Additionally, Plaintiff has reasonable cause to believe that he was targeted with ionizing radiation from such through-the-wall x-ray surveillance equipment for the purpose of inflicting substantial pain and discomfort to Plaintiff in order to constructively remove Plaintiff from his university apartment and academic program at the university.

23) Because the methods of enforcement used by Defendants, under color of law, caused Plaintiff to have reasonable fear of physical injury, serious physical injury, or death, on 11/10/2021 Plaintiff withdrew from the University of New Orleans and returned to New York to seek help in resolving the immigration pursuit that had now turned to cruel, unusual, and inhumane subtle forms of violence against Plaintiff, such as directing ionizing radiation at

Plaintiff for the purposes of creating hostile environments for Plaintiff intended to deprive Plaintiff his Fifth Amendment due process right, to forcibly run Plaintiff out of the country.

24)    In New York, Plaintiff experienced an escalation in the activities of Defendants towards Plaintiff. Plaintiff alleges that he does not understand what probable cause would merit the severe surveillance of Plaintiff. For 29 months, and counting, Plaintiff continues to sustain injuries from violations of Plaintiff's civil rights and Constitutional liberties from a protracted immigration pursuit originally premised on the allegation that Plaintiff's petition for permanent residence would be denied and that Plaintiff would be deported. After approval of Plaintiff's petition for permanent residence, the immigration pursuit has persisted and now employing cruel, unusual, and inhumane methods intended to deprive Plaintiff his Constitutional due process right to forcibly remove Plaintiff from the United States.

**Defendants:**

**JOHN DOE 1, UNKNOWN FEDERAL AGENTS, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JANE DOE 1, UNIVERSITY OF NEW ORLEANS, NEAL MARONEY, SUSAN BRADY**

25)    Defendant John Doe 1, is an individual who, during all times relevant to this complaint, appeared to be a federal agent most likely from immigration enforcement. By observation, Defendant John Doe 1 tracked, followed, surveilled, and harassed Plaintiff from April 2020 to September 2022. Defendant John Doe 1, appeared to have been waiting for orders to apprehend Plaintiff for the purpose of deporting Plaintiff from the United States.

26)    Defendants Unknown federal agents, are individuals who, during all times relevant to this complaint, appeared to have been a peripheral part of the illegal pursuit of Plaintiff. Plaintiff has reasonable cause to believe that some of the Unknown federal agents physically tracked,

followed, and surveilled Plaintiff, along with Defendant John Doe 1. While others may have assisted remotely from their offices.

27)     Defendants John Doe 2, and Jane Doe 1, were a couple and Plaintiff's neighbors at New Paltz Gardens Apartments, 5 Colonial Dr, New Paltz NY, from September 2019 to April 2020. During that period, Defendants John Doe 2, and Jane Doe 1 exhibited xenophobia and racial animus toward Plaintiff. At all times relevant to this complaint, Defendants John Doe 2, and Jane Doe 1 initiated the immigration pursuit by engaging Defendants John Doe 1, and Unknown federal agents. By observation, Defendants John Doe 2, and Jane Doe 1, followed along with Defendants John Doe 1, and Unknown federal agents, acting under federal color of law, tracking, following, surveilling, and harassing Plaintiff. And saying, inter alia, things such as "we caught him," and "we want to see it for ourselves" (intimating at the expectation of Plaintiff's deportation).

28)     Defendant John Doe 3, at all times relevant to this complaint, appeared to have been engaged by Defendants John Doe 1, and Unknown federal agents, functioning under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies to verbally harass Plaintiff, while Plaintiff resided at 267 Covert St Brooklyn NY 11207. Defendant John Doe 3 appeared to have been a resident from the neighborhood of the aforementioned address.

29)     Defendant the University of New Orleans is a higher education institution located at 2000 Lakeshore Dr, New Orleans, Louisiana 70148. At all times relevant to this complaint, Plaintiff resided in campus housing and was enrolled as a full-time PhD candidate at the University.

30)     Defendant John Doe 4 was at the time relevant to this complaint, employed as a Sargent with the university police at the University of New Orleans. Plaintiff reported incidents of being tracked and followed to Defendant John Doe 4, who assured Plaintiff that Plaintiff would

be provided with a police report, and that an investigation would be conducted. Plaintiff has reasonable cause to believe that upon Defendant John Doe 4 finding out that Plaintiff was being tracked and followed by federal agents, Defendant John Doe 4 acceded to federal authority and became indifferent to Plaintiff's requests for help.

31)    Defendant John Doe 5 was, at the time relevant to this complaint, employed as an officer with the university police at the University of New Orleans. Defendant John Doe 4, instructed Defendant John Doe 5 to write the police report and assigned Defendant John Doe 5 to Plaintiff's case. Plaintiff asserts that Plaintiff followed up several times, but was never provided the police report, or the opportunity to meet with Defendant John Doe 5 regarding Plaintiff's complaint to university police.

32)    Defendant Neal Maroney was at the time relevant to this complaint, employed as a professor at the University of New Orleans 2000 Lakeshore Dr, KH 438E, New Orleans, Louisiana 70148, for one of Plaintiff's classes. Plaintiff has reasonable cause to believe that Defendant Neal Maroney had acceded to federal authority and engaged in creating an abusive environment for Plaintiff within the class – at one point shouting, "let's get rid of this shit," after Plaintiff tried to clarify a fellow student's question.

33)    Defendant John Doe 6, was at the time relevant to this complaint, employed at the Boulevard Men's Residence BRC, 2027 Lexington Avenue, New York, NY 10035 where Plaintiff resided temporarily from 12/18/2021 to 3/5/2022. Plaintiff has reasonable cause to believe that Defendant John Doe 6 was communicating with Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies, when Defendant John Doe 6 angled his phone, which appeared to be facetime and on loud speaker, to get Plaintiff in the video

frame and unknown individuals on the other side exclaiming, "weird guy," (which has been one of the phrases Defendants have used to describe Plaintiff).

34)     Defendant Susan Brady, was at the time relevant to this complaint, employed with the Boulevard Men's Residence BRC, 2027 Lexington Avenue, New York, NY 10035, under the Department of Homeless Services for the City of New York (from here on "NYC DHS"). Plaintiff has reasonable cause to believe that Defendant Susan Brady was influenced by Defendants John Doe 1 and Unknown federal agents, acting under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies to issue Plaintiff with an untrue mental health diagnosis that Plaintiff has reasonable cause to believe served a twofold purpose, 1) to discredit Plaintiff's claims of being tracked, followed and surveilled, and 2) manufacture aggravating factors that could be used to deny Plaintiff a future benefit that Plaintiff would otherwise qualify for, such as adjusting from permanent residence to citizenship. In any case, the diagnosis was made negligently.

## V.    <u>EXHAUSTION OF ADMINISTRATIVE AND OTHER REMEDIES</u>

35)     On 4/3/2020, Plaintiff requested to be released from his lease at New Paltz Gardens Apartments, 5 Colonial Drive, Apartment C, New Paltz NY 12561 (Exhibit 1).

36)     On 9/15/2020, Plaintiff moved to a different town in Poughkeepsie NY

37)     On 09/29/2020, Plaintiff filed a bias report with the State University of New York at New Paltz (Exhibit 2).

38)     On 10/20/2020, Plaintiff reported incidents of harassment at the local police station at 62 Civic Center Plaza in Poughkeepsie NY (Exhibit 3).

39)     On 12/30/2020, Plaintiff moved to Brooklyn New York.

**40)**    Sometime between April 2021 and June 2021, Plaintiff asked for help at the police precinct covering Plaintiff's address at 267Covert St, Brooklyn NY 11207.

**41)**    On or around 06/25/2021, Plaintiff moved out of state to New Orleans, Louisiana.

**42)**    On or around 07/01/2021, Plaintiff reported being tracked and followed to campus police at the University of New Orleans.

**43)**    On 8/18/2021, Plaintiff filed a bias report with the University of New Orleans (Exhibit 4).

**44)**    On 9/25/2021, Plaintiff filed a discrimination complaint with the United States Department of Justice (DOJ) (Exhibit 5).

**45)**    On 11/10/2021 Plaintiff withdrew from the University of New Orleans and moved back to New York (Exhibit 6).

**46)**    On 1/11/2022, Plaintiff filed a civil rights complaint with the United States Department of Homeland Security (DHS) (Exhibit 7).

**47)**    On 01/19/2022, and 02/01/2022 Plaintiff made FOIA requests with the United States Citizenship and Immigration Services (USCIS), and United States Federal Bureau of Investigation (FBI), respectively (Exhibits 8, and 9).

**48)**    On 6/03/22 Plaintiff filed a civil law suit under Freedom of Information and Administrative Procedures Acts (Exhibit 10)

## VI.    <u>FACTS</u>

### <u>[Part 1] New Paltz Gardens Apartments, New Paltz, NY</u>

**Defendants: John Doe 2 and Jane Doe 1**

49)    Plaintiff incorporates by reference the assertions contained in Paragraphs 1 through 48, above, as if fully set forth in this section.

50)    In September 2019, Plaintiff moved to New Paltz, New York at New Paltz Gardens Apartments, 5 Colonial Drive, Apt C, New Paltz, NY 12561, to be close to the State University of New York at New Paltz (SUNY New Paltz) where Plaintiff was enrolled in a second-degree program in economics.

51)    While living at the address noted in Paragraph 50, Plaintiff experienced xenophobia and racial animus directed at him from a Couple (man and woman, from here on John Doe 2 and Jane Doe 1) who lived in the same building in Apartment B. Plaintiff alleges that shortly after moving into his apartment, Defendants John Doe 2 and Jane Doe 1 would incessantly talk about Plaintiff, expressing angst that Plaintiff had moved into the building. Plaintiff among other things alleges hearing Defendant Jane Doe 1 say, "we cannot let him get comfortable." In the weeks and months that followed, Plaintiff alleges, and reported to property management, that Defendants John Doe 2 and Jane Doe 1, who had blatantly become inimical toward Plaintiff, among other things; 1) would say that Plaintiff was weird and sad, 2) each time Plaintiff was home in his apartment, Defendants John Doe 2 and Jane Doe 1, in the apartment below, would play loudly, audio of monkey sounds, while talking about Black people in a disparaging sense, 3) On or around 3/26/2020, Defendant Jane Doe 1 screamed loudly saying, "why are you here?" "Get out of here." 4) As the verbal harassment progressively worsened, there were screams such as "put him down," intimating at violence toward Plaintiff, and 5) on

a couple of occasions, there was the use of the n-word by Defendant Jane Doe 1. Plaintiff upon belief and observation was the only Black resident in the building at the time. Plaintiff reached out to property management and requested to be released from his lease. Upon information, Plaintiff was told that he would not be released from his lease but instead would be assigned a different apartment unit in a different building.

**52)**    Plaintiff accepted the assignment of a different apartment unit, and on April 18, 2020, Plaintiff moved into New Paltz Gardens Apartments, Apartment 11F, New Paltz, NY 12561. However, for reasons unknown to Plaintiff, the biased harassment continued at the new unit. On the first day in the new unit, a resident from the apartment above screamed saying, "somebody get that monkey out of here." Plaintiff, upon observation, believed that the harassment at the new unit was perpetuated by Defendants John Doe 2 and Jane Doe 1 from Plaintiff's previous building. Plaintiff alleges hearing Defendant Jane Doe 1 saying to residents in Plaintiff's current building that, "we had to treat him like shit to get him out." Plaintiff believes that the bias incidents directed toward him were unprovoked, and were out of Plaintiff's control. Even so, Plaintiff tried everything within his control to attenuate, what seemed like a worsening situation. However, Plaintiff understood that it was not his decision to stop the xenophobia and racial animus – Defendants John Doe 2 and Jane Doe 1 had for some reason become fixated with making Plaintiff uncomfortable in his apartment and in the community.

**[Part 2] April 2020: Beginning of involvement of Defendants John Doe 1 and Unknown**

**federal agents**

**Defendants: John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1**

53)    At some point starting in late-April 2020, and still while living at New Paltz Gardens
Apartments, Plaintiff began hearing people in and around the building talk about Plaintiff's
immigration status. At the time, Plaintiff's immigration petition for permanent residence was
being processed by the United States Citizenship and Immigration Services (USCIS). Plaintiff
alleges that he would hear people in the building talk about how Plaintiff was going to get
deported and would say things such as "we got him now," "soon it will all be over," and other
times Defendant Jane Doe 1 would shout loudly, from the apartment above saying, "bye," as
if to intimate at the expectation that Plaintiff was getting deported. Plaintiff, from observation,
believed that Defendants John Doe 2 and Jane Doe 1 had engaged individuals from federal law
enforcement, most likely including but not limited to immigration enforcement, in an effort to
try to get Plaintiff removed from the country. Plaintiff, by experience, believed that the
involvement of Defendants John Doe 1 and Unknown federal agents, was essentially an
extension of the bias incidents, and devoid of any legal basis or probable cause.

54)    Plaintiff, by observation and experience, believes the verbal harassment, at New Paltz
Gardens Apartments, noticeably escalated because of the involvement of federal officers acting
under color of federal law.

55)    On September 15, 2020, Plaintiff moved to a different town, at Bridge Park Apartments,
20 N Bridge St, Apartment 22A, Poughkeepsie, NY 12601; hoping that moving to a different
town would end the unprovoked harassment from New Paltz Gardens Apartments. Plaintiff

was tracked, and followed to his current address by Defendants John Doe 1, John Doe 2 and Jane Doe 1, and their proxies.

56)    Plaintiff asserts that he remembered feeling extremely afraid for his safety when he was followed to his new address.

57)    By observation and experience, Plaintiff asserts that Defendants John Doe 2 and Jane Doe 1 would primarily be in the apartment above Plaintiff's, which at the time of Plaintiff moving into the building was occupied by an older woman and her daughter. Additionally, Plaintiff has reasonable cause to believe that other residents, from Plaintiff's building, and around the housing complex were influenced against Plaintiff, by Defendants John Doe 1 and Unknown federal agents acting under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies. Plaintiff believes access to the housing complex was granted because Defendants acted under federal authority.[1]

58)    Plaintiff asserts that Defendants John Doe 1 and Unknown federal agents, including John Doe 2 and Jane Doe 1, constantly verbally harassed, and intimidated Plaintiff; shouting phrases such as, "get out of here," and "you don't belong here," which Plaintiff believed was a form of national origin discrimination.

59)    On or around 9/22/2020, Plaintiff alleges hearing Defendant Jane Doe 1, from the apartment above saying, "where is Nathan so we can get him (Plaintiff) the hell out of here."

---

[1] The Courts have explained the power of government authority, as it relates to Federal and State agents and officers' ability to gain access to an area of interest. "The mere invocation of federal power by a federal law enforcement official will normally render futile any attempt to resist an unlawful entry or arrest by resort to the local police; **and a claim of authority to enter is likely to unlock the door as well**. See *Weeks v. United States* … **"In such cases there is no safety for the citizen, except in the protection of the judicial tribunals,** for rights which have been invaded by the officers of the government, professing to act in its name. There remains to him but the alternative of resistance, which may amount to crime." *United States v. Lee"* [Emphasis added] [The distinction between using federal authority to gain access to a suspect's home and using federal authority to gain access to homes adjacent to that of the suspect, for the purpose of surveilling the suspect are immaterial. A reasonable argument could be made that in the latter scenario, federal authority would be more effective in opening doors.]

Plaintiff has reason to believe that Nathan was an individual affiliated with the federal government, and that, in the context of Defendant Jane Doe 1's statement implied that Nathan had authority to arrest Plaintiff for the purpose of deporting Plaintiff. A few minutes later, a resident from the building, while leaving the building exclaimed, "he's out," "she's (Defendant Jane Doe 1) on the phone, they are coming to get him out," to which an unknown individual responded saying "that fast!" Plaintiff alleges that he had just moved into his apartment on 9/15/2020, and Defendants had already demonized Plaintiff to his community.

60)    On a different occasion, shortly after Plaintiff had moved into the apartment referenced in Paragraph 55, unknown individuals in what appeared to be a gray Dodge van with tinted windows drove into Plaintiff's parking lot, shining high beams at Plaintiff, while Plaintiff was entering his vehicle. The individuals inside appeared to have been on the phone when one of them screamed saying "he is right here," "he needs to get the fuck out," before hastily driving off. Plaintiff believes these individuals were proxies for Defendants John Doe 1, Unknown federal agents, John Doe 2, and Jane Doe 1, sent to intimidate Plaintiff.

61)    On 10/20/2020 Plaintiff reported incidents of harassment at the local police station close to Plaintiff's apartment (Exhibit 3). Plaintiff alleges that while waiting for assistance at the front desk, a female officer said "they are saying he is a "weird guy" (which was one of the terms frequently used by Defendants to describe Plaintiff). Plaintiff was asked if he knew the names of the Defendants, to which Plaintiff responded, he did not and explained that Defendants John Doe 2 and Jane Doe 1 were Plaintiff's neighbors at New Paltz Gardens Apartments in New Paltz, NY. Plaintiff was later informed that there was little the police could do without actual names. However, the comment by the female officer, while Plaintiff waited

to be assisted intimated at the possibility that Defendants, had access and/or influence at the local Police station.

**62)**     Sometime in the month of November 2020, Plaintiff received results from his first covid-19 test. Plaintiff asserts that the result came back positive. Plaintiff asserts that he immediately reached out to the landlord to let him know about the positive covid-19 result - so that Plaintiff's neighbors would be made aware. A few days later Plaintiff alleges that Defendant Jane Doe 1, with unknown individuals drove into a parking lot adjacent to Plaintiff's apartment and screamed "die already" after mentioning a few details about Plaintiff's positive covid test.

**63)**     Plaintiff asserts feeling substantial emotional distress because of the activities of Defendants John Doe 1 and Unknown federal agents, acting within the scope of their federal employment, coupled with the activities of Defendants John Doe 2 and Jane Doe 1 and their proxies, tracking, following, surveilling, and harassing Plaintiff at his new address.

**64)**     As a direct and proximate consequence of the hostile living environment created by Defendants, on 12/30/2020 Plaintiff moved to Brooklyn NY. Plaintiff asserts that classes at SUNY New Paltz were being conducted online due to covid-19, and as such Plaintiff reasoned he could attend his classes remotely from Brooklyn NY.

**[Part 3] January 2021: Plaintiff moves back to Brooklyn, NY**

**Defendants: John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and John Doe 3**

65)    In Brooklyn, Plaintiff was briefly in temporary housing before moving into a room on or about March 15, 2021, at 267 Covert St, 2nd Fl, Brooklyn NY 11207. Plaintiff was tracked, and followed to Brooklyn NY, by Defendants John Doe 1, Unknown federal agents, John Doe 2 and Jane Doe 1, including their proxies.

66)    Plaintiff believes that Defendants John Doe 1 and the Unknown federal agents, acting under color of law, exercised federal authority to gain access to the building, on the 1st and 3rd floors, and other buildings on the block (See footnote 1). Plaintiff alleges hearing Defendant John Doe 2 and Jane Doe 1 from the room directly above Plaintiff's room on the third floor explaining to residents in the building that they were getting Plaintiff out. Plaintiff by information asserts that the room above was previously occupied at the time that Plaintiff had moved into the building. Additionally, Plaintiff alleges hearing Defendant John Doe 1 on the first floor telling residents there that Defendants caught Plaintiff and that Plaintiff was getting deported.

67)    Plaintiff was surveilled from within the building and from around the neighborhood block. Plaintiff alleges that he observed being followed, in real time, every time Plaintiff left the apartment building.

68)    Plaintiff alleges that in addition to constantly being tracked, followed and surveilled, Defendants John Doe 1 and Unknown federal agents, functioning under color of law, including Defendants John Doe 2, and Jane Doe 1, and their proxies, had engaged in casting aspersions about Plaintiff, demonizing Plaintiff, and suggesting, among other things, that Plaintiff was involved in criminal activities, and was getting deported.

69)    Additionally, Plaintiff asserts that he noticed the use of local residents as proxies for Defendants. The primary proxy from the neighborhood was Defendant John Doe 3, who had become just as fixated about verbally harassing Plaintiff and echoing aspersions cast about Plaintiff by Defendants John Doe 1, John Doe 2, Jane Doe 1, and their proxies. On several occasions, Plaintiff alleges hearing Defendant John Doe 3, explaining to unknown individuals who appeared to be Defendant John Doe 3's friends that Defendant John Doe 3 would take Plaintiff's property after Plaintiff was deported. Plaintiff believes that, among other things, this incentivized Defendant John Doe 3 to become fixated with verbally harassing Plaintiff, including echoing false allegations that Plaintiff was a criminal and was getting deported.

70)    Plaintiff alleges that Defendant John Doe 3 would gather with his friends in front of a garage next to the building where Plaintiff rented a room, and would play loud music and drink, a camaraderie among friends, which by observation Plaintiff understood was not an unusual activity, at least in this neighborhood of Brooklyn NY. Plaintiff observed several similar gatherings around the neighborhood.

71)    However, Plaintiff, alleges that what made the gathering of Defendant John Doe 3 and his friends a little unusual was that they engaged in verbally harassing Plaintiff. On or around May 6, 2021, some of the things Defendant John Doe 3 screamed at Plaintiff, included but were not limited to the following: "bye – we are waiting for him to get kicked out," "get that black guy out," "get out of here," "we are going to laugh in your face," "please here – take your shit," "throw that shit," "they got him," 'they got you," "you gotta get out of here you little monkey."

72)    On a different occasion, Defendant John Doe 2 screamed from the floor above saying, "we need to get him out," "I have spent enough money on this," "get out of here," "he has no idea what's coming."    Plaintiff believes Defendants may have, among other things, been

compensating individuals to get them to act as proxies. Additionally, the statement that Plaintiff had no idea what was coming, intimates at the possibility that Defendants had planned to eventually use cruel, unusual, and inhumane methods, such as spraying ionizing radiation at Plaintiff to intentionally cause Plaintiff excruciating pain and discomfort in order to deprive Plaintiff of his Constitutional due process right and run Plaintiff out of the country.

73)    Around late-April 2021, Plaintiff was working on his response to a request for evidence from USCIS, which was processing Plaintiff's petition for permanent residence at the time. Plaintiff asserts that he decided to draft the response by hand, and only type it when it was ready. Plaintiff alleges hearing an unknown woman, from the room above say "he is doing it by hand," "I am going to need one of those x-ray machines" Plaintiff alleges that those comments suggested that Plaintiff's devices had been compromised, and that Defendants were able to see Plaintiff's activities on his devices. Additionally, the need and to use an "x-ray machine" in order to see Plaintiff's hand written notes, without probable cause, implied violations of Plaintiff's Forth Amendment right to the Constitution of the United States.

74)    Plaintiff alleges that almost every morning Defendant John Doe 1 would scream, "he's out" as if announcing to people on the block that Plaintiff was getting deported that day.

75)    Plaintiff alleges that there was a substantial escalation at the address referenced in Paragraph 65, so much so that Plaintiff alleges hearing Defendant John Doe 1 appearing to be explaining to Defendants John Doe 2 and Jane Doe 1, in the room above, saying, "someone is trying to help "weird guy" ("weird guy" is one of the terms used by Defendants to describe Plaintiff)."

76)    Plaintiff alleges that he tried to go to the police precinct to see if they could help, but was told what Plaintiff had been told before when Plaintiff tried to ask for help from the police in Poughkeepsie. That is, without the names of the Defendants, the was little the police could do.

77)    On May 21, 2021, Plaintiff's petition for permanent residence was approved by the United States Citizenship and Immigration Services (USCIS). Plaintiff asserts that when Defendants found out about the approval of Plaintiff's legal permanent residence, Plaintiff alleges hearing Defendant Jane Doe 1 from the room above say, "**we will keep doing this until we run him out of the country**." Which, up until this point, Plaintiff believed involved tracking, following, and surveilling Plaintiff, demonizing Plaintiff, and suggesting Plaintiff was involved in criminal activities.

78)    In *Horton v. California (1990)*, the Supreme Court explained that "… evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer."

79)    Plaintiff alleges that Defendants John Doe 1 and Unknown federal agents, acting under color of law, were not following objective standards of conduct in their pursuit of Plaintiff. Plaintiff alleges that Defendants John Doe 1 and Unknown federal agents, had made pursuing Plaintiff a personal matter and had become excessively obsessed with attempting to have Plaintiff deported from the United States.

80)    Additionally, when Defendants John Doe 1 and Unknown federal agents decided to "keep doing this until we run him out of the country,"[2] as noted in Paragraph 77, "evenhanded" enforcement was lost. Plaintiff further alleges that the immigration pursuit most likely had no

---

[2] In *Horton v. California* (1990) Justice Harlan seemed to intimate that a threat to civil liberties would arise from federal officers who approach law enforcement based on their state of mind rather than objective applicable laws. Essentially saying that when law enforcement personnel, enforce the laws based on "how they feel," the probability of violations of civil liberties substantially increase.

legal basis because it had ensued from the bias incidents directed at Plaintiff by Defendants John Doe 2, and Jane Doe 1 who appeared to believe they could get Plaintiff deported from the country by leveraging federal authority. And had literally packed up their lives and followed along with Defendants John Doe 1 and Unknown federal agents, acting under color of federal law, tracking, following, surveilling, and verbally demonizing Plaintiff by suggesting that Plaintiff was a criminal, "we caught him" and "we want to see it for ourselves," (the alleged deportation of Plaintiff).

**81)**    Plaintiff alleges that as a direct consequence of Defendants tracking, following, surveilling, and casting aspersions about Plaintiff, at Plaintiff's address in Brooklyn NY, Plaintiff suffered substantial emotional distress. Defendants had thus far become excessively fixated on depriving Plaintiff his civil rights and Constitutional liberties and creating hostile living environments at every subsequent address Plaintiff moved to in New York.

**82)**    After the approval of Plaintiff's petition for permanent residence, Plaintiff decided to apply to PhD programs a year earlier than he had planned. Plaintiff had only three classes left to finish at the State University of New York in New Paltz, and decided to try to arrange to finish those classes remotely and concurrent with his PhD program. Plaintiff was readmitted into the financial economics PhD program at the University of New Orleans in Louisiana.

**83)**    Plaintiff decided to move out of state to Louisiana. Hoping that the distance, coupled with the fact that Plaintiff's petition for permanent residence was approved would finally bring what appeared to be an unlawful pursuit of Plaintiff to a conclusion.

### [Part 4] July 2021: University of New Orleans

**Defendants: John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, University of New Orleans, John Doe 4, John Doe 5, Neal Maroney**

84)   On or around June 26, 2021, Plaintiff moved from Brooklyn New York to New Orleans Louisiana to attend a PhD program as well as get away from the harassment directed toward Plaintiff by Defendants John Doe 1 and Unknown federal agents, acting under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies following along. Plaintiff had hoped that the distance coupled with the fact that Plaintiff had been given the amazing privilege of residing permanently in the United States would discourage Defendants from continuing to pursue Plaintiff.

85)   Upon arriving in New Orleans, Plaintiff spent a couple of days in a motel while waiting to move into his campus housing apartment. At the motel, Plaintiff alleges hearing Jane Doe 1 say, "why is he even here?" Plaintiff alleges that Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1 and their proxies had tracked, and followed Plaintiff from New York to New Orleans.

86)   Upon learning that Defendants John Doe 1, Unknown federal agents, John Doe 2, and Jane Doe 1, and their proxies, had tracked Plaintiff all the way to Louisiana, from New York, Plaintiff experienced substantial shock, fear, and emotional distress at the apparent obsession with Plaintiff, Defendants had exhibited.

87)   On June 30, 2021, Plaintiff moved into unit C105 Lafitte Village, campus graduate housing at the University of New Orleans.

88)   Plaintiff asserts that part of the reason for moving into campus housing was his expectation that, any form of harassment would not be permitted on campus grounds.

89)    Plaintiff alleges that Defendants John Doe 1, and Unknown federal agents, acting under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies, got access to the housing complex in apartments C104, C106, and C205 that were adjacent to Plaintiff's apartment (See footnote 1).

90)    On or around July 1st, 2021, Plaintiff asked campus police at the University of New Orleans for help regarding the presence and activities of Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies.

91)    Plaintiff spoke with John Doe 4, who at the time, Plaintiff believes had the title of Sargent. Defendant John Doe 4 assured Plaintiff he would look into the matter and instructed Defendant John doe 5 to draft a police report alleging allegations raised by Plaintiff that Plaintiff had been tracked and followed to New Orleans, and was being surveilled from within the graduate campus housing complex.

92)    By observation, Plaintiff had reasonable cause to believe campus police eventually confirmed Plaintiff's allegations that Defendants John Doe 1 and Unknown federal agents, acting within the scope of federal employment, including Defendants John Doe 2, and Jane Doe 1, and their proxies had tracked, and followed Plaintiff to New Orleans, and had gained access at the graduate campus housing.

93)    Plaintiff alleges that university police appeared to have acceded to Defendants John Doe 1 and Unknown federal agents acting within the scope of their employment.

94)    Plaintiff alleges that he has reasonable cause to believe that Defendants John Doe 1 and Unknown federal agents, acting within the scope of their employment, including Defendants John Doe 2 and Jane Doe 1, and their proxies attempted to manufacture an appearance of

exigent circumstances around Plaintiff, by among other things demonizing Plaintiff in ways suggesting that Plaintiff was predisposed to violence.

95)    Plaintiff alleges that the aesthetics of being tracked and followed, all the way from New York to New Orleans, by Defendants John Doe 1 and Unknown federal agents exercising federal color of law, to stoke fears about Plaintiff, including John Doe 2, Jane Doe 1 and their proxies, mostly Caucasian, "riding-along," albeit under the umbrella of federal color of law, technically as vigilantes, casting aspersions at Plaintiff, who is of African descent, and subjecting Plaintiff to extremely intrusive surveillance created a false sense of emergency especially at a setting such as a public university.

96)    Plaintiff further alleges that Defendants John Doe 1 and Unknown federal agents, acting within the scope of federal law continued to lie to individuals in Plaintiff's community that Plaintiff was getting deported even after Plaintiff had been legally granted permanent residence in the United States. Plaintiff believes Defendants continued to lie because Defendants declared to continue to deprive Plaintiff his civil rights and Constitutional liberties in order to run Plaintiff out of the country as stated in Paragraph 77.

97)    Plaintiff alleges that Defendants John Doe 1 and Unknown federal agents, acting under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies, had become unusually excessively obsessed with Plaintiff, trying to get Plaintiff deported and needed a reason for that to happen. As such, Defendants engaged in conduct toward Plaintiff such as peddling fear about Plaintiff in ways that suggested Plaintiff was predisposed to violence, demonizing Plaintiff to socially isolate Plaintiff, and attempting to define Plaintiff as a public safety concern, to create the appearance of exigent circumstances enough to get Plaintiff's

permanent residence revoked, and/or continue to harass and intimidate Plaintiff so that Plaintiff would voluntarily leave the country.

98)    Plaintiff alleges that Defendants engaged in such activities (Paragraphs 94 to 97) for no reason except that Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies, refused to accept Plaintiff's lawfully granted permanent residence and instead engaged in egregious violations of Plaintiff's Constitutionally protected rights in order to create an appearance of exigent circumstances, and to frustrate Plaintiff's living and learning environment with the intent to "… keep doing this, until we run him out of the country." (See Supra at Paragraph 77)

99)    Plaintiff alleges that for the rest of the month of July 2021, he was continuously tracked, and followed including when Plaintiff went out for runs to exercise. Plaintiff alleges that while he was out on runs Defendants and their proxies followed him in their vehicles and would sometimes scream "get out of here" at Plaintiff as they drove past Plaintiff.

100)    The first two of weeks of August 2021, and about a couple of weeks before classes started, Plaintiff alleges that he started noticing he was now being followed by campus police at the University of New Orleans, in addition to the activities of Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies.

101)    Plaintiff alleges that for reasons stated in Paragraphs 94 through 100, Plaintiff was essentially defamed by the activities of Defendants John Doe 1 and Unknown federal agents, acting under the scope of federal law, including Defendants John Doe 2 and Jane Doe 1, and their proxies.

102)    Plaintiff believes it is reasonable to infer that as a consequence of the defamation of Plaintiff's character and reputation, Plaintiff, rather than being viewed as a student by the

campus community, Plaintiff was instead viewed as a safety concern. Not for anything Plaintiff had done – but that Defendants John Doe 1 and Unknown federal agents exercised federal authority to demonize Plaintiff as a criminal pending deportation. Additionally, Defendants John Doe 2 and Jane Doe 1 acting alongside Defendants John Doe 1 and Unknown federal agents, peddled fears about Plaintiff, suggesting that Plaintiff was inclined to violence.

103)    As a direct and proximate cause of the defamation of Plaintiff's character and reputation, Plaintiff alleges that he suffered substantial emotional distress, including experiencing subtle and sometimes blatant discrimination from some individuals in Plaintiff's campus community, including but not limited to university police, and one of Plaintiff's professors.

104)    Plaintiff alleges that as a consequence of being defamed, he experienced disparate treatment from university police, and that it became clear to Plaintiff that university police were not going to help Plaintiff. Instead, it appeared that university police were doing the bidding of Defendants John Doe 1 and Unknown federal agents acting within the scope of federal law. Plaintiff alleges that this marked the being of what Plaintiff would have reason to believe was the use of "through-the-wall" surveillance not only to intrude into Plaintiff's apartment but to also to direct ionizing radiation from such equipment at Plaintiff in order to inflict substantial pain and discomfort to constructively remove Plaintiff from his campus apartment and the academic program (Exhibits 11A, 11B, 12A, 12B, 13 and 14).

105)    On 8/6/2021 Plaintiff made the following entry in his journal, "The radiation is getting stronger. They have some type of x-ray equipment they are using to monitor me in my apartment."

106)    On 8/9/2021 Plaintiff wrote in his journal, "It seems to me that campus safety and housing administration have looked away from me and possibly explicitly gave permission to the group

from New Paltz to use their harassing and discriminatory methods to try to get me out of my

new apartment and possibly lose my opportunities in education.".

107)     On or around 8/9/2021, Plaintiff visited the main library at the University of New Orleans,

and noticed Defendant John Doe 4 at the front desk, processing what Plaintiff believed were

parking permits for the coming school year. Plaintiff alleges hearing Defendant John Doe 4

saying, after seeing Plaintiff walk by, "nobody wants him. He's got to go," "he is a weird guy."

Plaintiff alleges being shocked at hearing language that was consistently used by Defendants

John Doe 1, Unknown federal agent, John Doe 2, Jane Doe 1, and their proxies, to justify their

illegal pursuit of Plaintiff.

108)     On 8/10/2021, Plaintiff noted in his journal that the campus police personnel following

him, went and searched a trash can at a location on campus where Plaintiff had visited. Plaintiff

wondered why police would engage in searching trash cans in places Plaintiff had visited on

campus. Plaintiff asserts that it was amazing to witness this. However, Plaintiff believes he

understood that it was, in part, because of the reasons expressed in Paragraphs 94 through 100.

Plaintiff alleges that Defendants John Doe 1 and Unknown federal agents, using federal

authority, including Defendants John Doe 2 and Jane Doe 1, and their proxies, had severely

defamed Plaintiff's character and reputation for the purpose of creating the appearance of

exigent circumstances that could perhaps be used to remove Plaintiff from the country. Plaintiff

further alleges that while all this was happening, Plaintiff had not committed any crimes to

warrant such extreme violations of Plaintiff's civil rights and Constitutional freedoms.

109)     Plaintiff alleges that between 7/1/2021 and 8/9/2021, he followed up with campus police

multiple times asking for a police report, that had been promised over a month ago, that

Plaintiff intended to send to the United States Citizenship and Immigration Services (USCIS),

so that USCIS would furnish Plaintiff with a notice saying, in effect, that Plaintiff's immigration case was decided. Plaintiff hoped that in so doing, he could provide such a notice to campus officials to discredit the activities of Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies. Plaintiff alleges that it appeared that evidence of his permanent resident card was not enough to refute the lies of Defendants John Doe 1 and Unknown federal agents, acting under color of law, that Plaintiff's immigration status would be revoked and that Plaintiff would be deported.

110)    Plaintiff alleges that by observation and experience, that when federal agents invoke federal authority, people tend to accede. And might not see that federal authority was being used to perpetuate lies or to manufacture false evidence for the purposes of depriving an individual his civil and Constitutional rights.

111)    Plaintiff alleges that he knew why Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies engaged in what Plaintiff believed was illegal tracking and surveillance of Plaintiff, including essentially weaponizing surveillance equipment to furtively cause Plaintiff extreme pain and discomfort, was to intimidate Plaintiff in order to run Plaintiff out of the United States, without any due process, guaranteed by the Fifth Amendment to the Constitution of the United States. Plaintiff alleges that the community at the University of New Orleans did not know this fact, because Defendants John Doe 1, and Unknown federal agents lied under federal color of law. As such it was Plaintiff's word against that of Defendants John Doe 1, and Unknown federal agents acting under federal color of law.

112)    Plaintiff asserts that as someone who has both respect and fear for law enforcement, if approached by law enforcement alleging that an individual in Plaintiff's community was under surveillance because he was getting deported, Plaintiff would, as would many reasonable

individuals, be inclined to believe law enforcement over the claims of that individual (See footnote 1). Plaintiff believes that it is mostly because of invoking federal authority that Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies have been successful at isolating Plaintiff, creating hostile living environments for Plaintiff, and substantially depriving Plaintiff his civil and Constitutional rights.

113)   For the reason stated in Paragraphs 111 and 112 above, Plaintiff believed that if he had obtained a police report from university police, to use to request a notice from USCIS, stating that Plaintiff's immigration case was decided, that it would not only have been Plaintiff's word against Defendants, but it would have also been the government's word against Defendants, and by extension exposing the illegitimacy of the activities of Defendants. However, such relief was not afforded to Plaintiff, because university police did not provide Plaintiff a police report.

114)   On 8/18/2021 Plaintiff submitted a bias report with the University of New Orleans, alleging, among other things, the on-campus harassment and surveillance activities of Plaintiff by Defendants John Doe 1 and Unknown federal agents, acting under color of law, including Defendants John Doe 2, Jane Doe 1, and their proxies, tracking, following, surveilling, and harassing Plaintiff. Plaintiff, asserts that he was explained to that because Plaintiff's allegations were not committed by members of the campus community, at the time of Plaintiff's complaint, that it was difficult for the university to take action.

115)   After submitting the bias report with the university, Plaintiff alleges that the harassment and violence directed toward him substantially escalated.

116)   On 8/29/2021 around 7:30pm central time, Hurricane Ida had reached New Orleans. Plaintiff asserts that he chose to shelter in place during the storm. Plaintiff further asserts that Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies

were present at the University during the storm. Plaintiff alleges that Defendants appeared to have assumed the role of monitoring Plaintiff, because of the appearance of exigent circumstance which Defendants had manufactured in the first place.

117)    On 8/30/2021 Plaintiff made the following entry in his journal, "During the Hurricane I woke up around 4am thinking this was the day I was going to die. My eyes were burning, my throat was burning, my legs felt really weak, my arms too felt lifeless. My chest felt very warm. The only thing I could do to help myself was pick up my notebook and write about it."

118)    In the same entry, referenced in Paragraph 117, Plaintiff goes on to write "The winds are raging on outside, and inside, what seems to me as artificial radiation directed toward me is not letting up (Exhibits 11A, 11B, 12A, 12B, 13 and 14). I can either die in here or die out there in the storm."

119)    On 9/17/2021, Plaintiff wrote in his journal, "Just finished taking a shower. I was breathing it in the shower. It is so strong in my mouth." Plaintiff alleges his campus graduate housing apartment, started getting gassed with some form of irritant and almost odorless gas. This happened mostly when Plaintiff was taking a shower, but eventually became common place and would happen several times a day when Plaintiff was in his apartment unit. Plaintiff alleges that unknown individuals, who appeared to have been residents at the campus graduate housing complex would say things such as "they are trying to flush him out," as they walked past Plaintiff's apartment.

120)    Plaintiff alleges that the conduct by Defendants John Doe 1 and Unknown federal agents, acting under color of federal law, among other things, subjecting Plaintiff to ionizing radiation, several times a day, for the purpose of constructively removing Plaintiff from his campus apartment and academic program, gave Plaintiff reasonable fear of physical injury, serious

physical injury, or death. Plaintiff asserts that he documented several instances when Plaintiff progressively became concerned about his safety, his health, and his life.

121)    Plaintiff believed that because of the university's indifference toward Plaintiff, and the failure to prevent, or reasonably mitigate the conduct of Defendants John Doe 1, Unknown federal agents, John Doe 2, and Jane Doe 1 toward Plaintiff, directly and proximately caused the creation of a severe hostile living and learning environment for Plaintiff - which Plaintiff believed was intended to be so unbearable to constructively evict Plaintiff from his graduate housing unit, and to constructively remove Plaintiff from his academic program - because Plaintiff was no longer viewed as a student, but rather a safety concern; because Defendants had abused federal authority to severely demonize and defame Plaintiff, by among other things, severely intruding into Plaintiff privacy, subjecting Plaintiff to ionizing radiation, and suggesting that such conduct was justified because Plaintiff was "a weird guy," "a sad guy," and "not normal." Language that appeared to be intended to create the perception that Plaintiff was an individual predisposed to violence. Plaintiff alleges that Defendants used federal authority to manufacture these extreme and outrageous conditions for Plaintiff, because Defendants had been trying to manufacture reasons for Plaintiff to be deprived of equal protection of the laws, and intimidate Plaintiff to leave the United States without appropriate due process for their allegations that Plaintiff was getting deported.

122)    On 09/25/2021 Plaintiff submitted an online complaint with the Department of Justice (DOJ), regarding Plaintiff's concerns while at the University of New Orleans. Albeit the DOJ online complaint portal was limited to only about 500 words. Plaintiff alleges that 500 words were not enough to clearly capture the circumstances he had been experiencing.

**123)**    Plaintiff asserts that the forms of harassment and subtle violence described in Paragraphs 94 through 121 became so pervasive such that Plaintiff was targeted everywhere on campus grounds including while Plaintiff was attending his classes. Plaintiff has reasonable cause to believe that aerial surveillance had been employed to target Plaintiff in such pervasive ways. Albeit without probable cause, except that as stated in Paragraph 121, Defendants, acting under color of law, manufactured an extremely hostile environment for Plaintiff at the university, which gave them the need to severely intrude into Plaintiff's privacy, including subjecting Plaintiff to extremely harsh conditions, such as spraying Plaintiff with ionizing radiation to, among other things, constructively remove Plaintiff from the university – not because of any wrong doing by Plaintiff, but because the government, via Defendants professing federal authority, subjected Plaintiff to cruel, unusual, and inhumane treatment for the purposes of trying to run Plaintiff out of the country, and perhaps expected a violent reaction from Plaintiff. Defendants manufactured a need to constantly surveil Plaintiff, not because Plaintiff's conduct warranted such a need. Plaintiff alleges, that he understood that Defendants' intentions had been to create an appearance of such exigent circumstances in order to manufacture, among other things, reasons to justify Defendants' unlawful conduct toward Plaintiff, and reasons to deprive Plaintiff equal protection of the laws.

**124)**    On 9/28/2021, while attending one his classes, Plaintiff tried to clarify a question that a fellow classmate had asked. Upon doing so, the Professor, Defendant Neal Maroney, screamed "let's get rid of this shit." Plaintiff alleges that the language was consistent with Defendants John Doe 1, Unknown federal agents, John Doe 2, and Jane Doe 1's allegations that they were getting Plaintiff out of the country. Plaintiff alleges feeling out of place, afraid, embarrassed

and unwelcome in his class because of Defendant Neal Maroney discriminatory and abusive language toward Plaintiff.

125)    On 10/5/2021, Plaintiff alleges that while attending one of his classes, QMBE 6280, Plaintiff's professor, Defendant Neal Maroney some of Plaintiff's classmates, and Defendant John Doe 1, including unknown individuals privy to the activities of Defendants John Doe 1 and Unknown federal agents, were gathered in the hallway by one of the entrances to the lecture hall, Kirshman Hall 214, where Plaintiff's class was held.

126)    Plaintiff alleges that he had reason to believe that the conversation that was going on among them, was pertaining to Plaintiff, and appeared to suggest that on that day, 10/5/2021, Plaintiff was finally going to be apprehended for the purpose of deporting Plaintiff from the United States.

127)    Plaintiff alleges that at one point during the conversation referenced in Paragraph 126, a couple of his classmates made the following comments as they were walking back into the class, "he's out," one says, another responds, "I know, he's out," "I can't believe it" "I know, it's so sad, isn't it?" Defendant John Doe 1 then responds, "I don't give a fuck" Defendant John Doe 1 goes on to say, "I'm on the phone call," seeming to intimate that an order to arrest Plaintiff was being made. Defendant Neal Maroney then says "get him out of here," "just get out of here," "you gotta get him out" then adds, "are you sure?" "you said the same thing last time." Suggesting that Defendant John Doe 1 had previously assured Defendant Neal Maroney that Plaintiff was getting removed from the country. Classmates in the classroom, in close proximity to Plaintiff, were talking, appearing to be anticipating Plaintiff's removal, saying such things as "he's getting kicked out." One of the classmates asked "who?" and in the same breath asked again looking at Plaintiff, while trying not to appear obvious saying, "him?" To

which a different classmate answered, "yeah." Plaintiff alleges feeling concern and worry for himself wondering on what legal basis he would be arrested and deported; but at the same time acknowledging to himself that he (Plaintiff) needed this alleged deportation process to happen, because Plaintiff believed it would start the process for Plaintiff to exonerate himself of the allegations made against him by Defendants John Doe 1 and Unknown federal agents, acting under color of law, including Defendants John Doe 2, Jane Doe 1, and their proxies.

128)     At another point during the conversation referenced in Paragraphs 126 and 127, an unknown female seems to be fascinated at looking at the human brain. She says, "the human brain" the human brain," the professor, Defendant Neal Maroney then says, "oh my God that's him, right?" then adds "he's got to go." Plaintiff believes that at this moment, Defendants and unknown individuals participating in the conversation, were looking at Plaintiff's brain; most likely from a viewing device while Plaintiff was being sprayed with a concentrated amount of ionizing radiation, perhaps from the through-the-wall x-ray equipment used to surveil Plaintiff. Plaintiff alleges that while the conversation and viewing of this human brain was going on, Plaintiff was experiencing a severe headache, including pain and a burning sensation on the surface of his head and neck, and feeling extreme weakness in his arms and legs, and substantial nerve pain in his feet and a warming sensation in his palms. Plaintiff alleges that the conversation would continue with Defendant Neal Maroney saying "he's got to go," "nothing to do with …," (Perhaps suggesting that it had nothing to do with race), "he is a sad guy," "get out of here," and the unknown female would exclaim one more time, "the human brain."

129)     Plaintiff alleges that suggestions that Plaintiff 'had to go," because Plaintiff was perceived as sad, weird or crazy intimated that Defendants were defining Plaintiff as predisposed to

violence and as such, on the basis of such an abstract perception Plaintiff deserved to be treated disparately, and in what appeared to be cruel, unusual and inhumane ways. For absolutely nothing unlawful Plaintiff had done, except that Defendants John Doe 1 and Unknown federal agents, exercised federal authority to severely demonize and defame Plaintiff to his community. And thereby creating in their minds unsubstantiated fear towards Plaintiff. Which by extension created a community with general indifference toward Plaintiff, with the implication that Defendants, acting under federal color of law, could liberally target Plaintiff in cruel, unusual, and inhumane ways without fear of accountability.

130)    Plaintiff asserts that toward the end of the class, the professor, Defendant Neal Maroney's phone made a sound, that appeared to be an alert for an incoming message. Defendant Neal Maroney briefly viewed his phone, then said, "good luck with the cooking." Plaintiff believes that the comment was made because the expectation that Plaintiff would be removed that day, 10/5/2021, was not going to happen, prompting Defendant Neal Maroney to make the comment "good luck with the cooking" to imply that Defendants were going to continue using ionizing radiation to target Plaintiff.

131)    Plaintiff further asserts that after the class, referenced in Paragraphs 125 through 130, had ended, a classmate repeated the Professor's comment and said, "good luck with the cooking," while Plaintiff was walking out of the building. Plaintiff alleges that the comments by the professor, and some of Plaintiff's classmates showed the extent to which Plaintiff had been severely demonized and defamed by the conduct of Defendants John Doe 1 and Unknown federal agents, acting under color of federal law.

132)    On 10/8/2021 Plaintiff alleges that the University of New Orleans conducted a campus wide emergency alarm test. Plaintiff was attending one of his classes at the time that the

emergency alarm test was scheduled to happen. During the alarm, the Professor, Defendant
Neal Maroney suggested that it was an "air raid type thing." Plaintiff alleges that a classmate
immediately responded to Defendant Neal Maroney's comment and said, "Maybe the problem
at our desks." Plaintiff alleges that the comment by the classmate, was in reference to Plaintiff,
and appeared to give credence to Plaintiff's allegations that as a result of the conduct of
Defendants John Doe 1 and Unknown federal agents, using federal authority to, among other
things, severely demonize and defame Plaintiff, changed the perceptions of some individuals
withing Plaintiff's campus community to view Plaintiff as a "problem" rather than as a fellow
student.

133)    Plaintiff alleges that when the classmate intimated at Plaintiff being the reason for the
planned emergency alarm test, appeared to suggest the extreme extent to which Plaintiff had
been demonized and defamed as a result of actions by Defendants John Doe 1 and Unknown
federal agents, acting within the scope of federal law, including Defendants John Doe 2, and
Jane Doe 1, and their proxies toward Plaintiff. Plaintiff asserts that he suffered substantial fear
and emotional distress from being in an environment where Plaintiff was severely demonized,
defamed, and targeted in cruel, unusual and inhumane ways. What if someone in the
community decided to act proactively because they truly believed that Plaintiff was
predisposed to violence? Plaintiff alleges that the conduct of Defendants demonizing,
defaming, and targeting Plaintiff in cruel, unusual, and inhumane ways created substantial
safety risks for Plaintiff from the possibility of individuals acting proactively against Plaintiff.

134)    Plaintiff alleges that as time progressed, and Plaintiff was still attending his classes,
because the anticipated deportation had not happened, Plaintiff noticed an escalation in the
harassment and violence toward him, with Defendants sometimes screaming things such as,

"we need to surround him." Which Plaintiff believed implied the need to maximize the effects of the harassment and violence towards Plaintiff. That is, spraying ionizing radiation at Plaintiff from all adjacent apartments to that of Plaintiff's.

135) On or around 10/26/2021, the day of Plaintiff's mid-term exam for QMBE6280, Plaintiff alleges that both doors to the lecture hall were left open, and unknown individuals outside the lecture hall were, among other things saying things like "get out of here." Plaintiff believed that the doors were intentionally left open in order to interfere with Plaintiff's ability to take his exam by these unknown individuals repeating the harassing language that had been used on Plaintiff since the provenance of the bias incidents from New Paltz NY. Additionally, Plaintiff was severely targeted with ionizing radiation to interfere with Plaintiff's ability to take the exam. Plaintiff experienced severe symptoms similar to those stated in Paragraph 128. Plaintiff experienced severe weakness in his arms and legs to the extent that Plaintiff struggled to hold a pen in his hand, in addition to the excruciating pain Plaintiff experienced. It was clear that the intent was to interfere with Plaintiff's ability to take his exam. Because, without good grades, Plaintiff would not continue in the program.

136) Plaintiff alleges that during the incidents described in Paragraphs 94 through 135, Plaintiff observed increased police presence, both university and local police mostly around the graduate housing complex. Plaintiff alleges that such an outcome intimates at the expectation that Plaintiff would respond to the harassment and violence in kind. However, Plaintiff asserts that to him, violence is inherently stupid and inimical to his values as an academic. Plaintiff alleges that the circumstances described in Paragraphs above left Plaintiff feeling hopeless in getting the help Plaintiff needed, and caused Plaintiff daily excruciating physical pain and

discomfort, and caused Plaintiff to suffer substantial emotional distress from fear of physical injury, serious physical injury, or death.

137)    Plaintiff alleges that the circumstances, while being at the University of New Orleans left Plaintiff feeling extremely traumatized from being trapped in Defendants' used of "through-the-wall surveillance" or aerial surveillance technologies[3] with capabilities of directing ionizing radiation that caused Plaintiff excruciating pain and discomfort, to the extent that Plaintiff started fearing being in his apartment and campus in general because of the ways in which Plaintiff was being targeted by Defendants exercising federal authority. The use of this type of through- the-wall surveillance, not only intruded into Plaintiff's privacy, but also caused Plaintiff severe pain and discomfort in those moments that it was happening.

138)    Plaintiff asserts that he ended up spending a lot of time in his car. Studying from his car, and tried as much as he could, and to the best of his abilities to minimize exposure to the aforementioned forms of violence noted in Paragraphs 94 through 137. This meant that, to avoid this type of violence, Plaintiff had to be anywhere but campus including his campus apartment.

139)    Plaintiff asserts that Defendants abused federal authority to constructively bar Plaintiff from accessing and using resources essential to his academic progress.

140)    Plaintiff asserts that Defendants' abuse of federal authority, under color of federal law, imposed a meaningful interference on Plaintiff's use and enjoyment of his apartment – which

---

[3] In *Kyllo v. United States* (2001), about 20 years ago, the Court made the following statement, "The ability to "see" through walls and other opaque barriers is a clear, and scientifically feasible, goal of law enforcement research and development. The National Law Enforcement and Corrections Technology Center, a program within the United States Department of Justice, features on its Internet Website projects that include a "Radar-Based Through-the-Wall Surveillance System," "Handheld Ultrasound Through the Wall Surveillance," and a "Radar Flashlight" that "will enable law enforcement officers to detect individuals through interior building walls." www.nlectc.org/techproj/ (visited May 3, 2001). Some devices may emit low levels of radiation that travel "through-the-wall," but others, such as more sophisticated thermal-imaging devices, are entirely passive, or "off-the-wall" as the dissent puts it.

Plaintiff believes amounts to violations of Plaintiff's Possessory Interest of the Fourth Amendment to the Constitution of the United States.

141)     Plaintiff alleges that when he was targeted in the manner described in Paragraphs 94 through 140, he could not retreat into his own apartment for safety[4]. That was not an option. There was literally nowhere to retreat to for safety.

142)     The website of the American Civil Liberties Union, New York Chapter, briefly describes some of the unlawful methods that could be used in an immigration pursuit[5]. Plaintiff alleges that the kind of violence described in Paragraphs 94 through 140, was a type of violence Plaintiff was never aware of, or that he thought was possible within the jurisdiction of the United States, and more importantly at an institution of higher education. However, Plaintiff understands from his experiences, and as suggested in footnote 5, that when an individual is isolated and demonized by federal agents professing federal authority, coupled with a community of private individuals exercising their collective and compounded privilege to stoke fear and otherize the targeted individual in an ominous sense, – for no legitimate reason except that the individual has been otherized as not belonging in the United States (national origin discrimination), under these circumstances any type of violence is possible. The ability to use advanced federal technologies to carry out such forms of violence as described in

---

[4] But when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's "very core" stands "**the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion**." *Silverman v. United States*, 365 U. S. 505, 511 (1961). [Emphasis added]

[5] "For years, some of our leaders have used ICE to divide us, determined to cruelly target, demonize, and demoralize immigrants and separate families. ICE's raids and scare tactics have cruelly separated families, and ICE has leaned on local law enforcement and government agencies, to aid their arrests, deportations, and family separation. Because of this, many immigrant New Yorkers and their families live with anxiety that living daily life in the open and interacting with government – whether in a police traffic stop, **attending school**, or **visiting a public hospital for care** – could lead to being torn away from family. This fear is especially damaging during the COVID-19 pandemic, pushing key communities away from the help they need to protect themselves and neighbor New Yorkers. **When local agencies work with ICE, it leads not only to unconstitutional racial profiling, but also to the misuse of local tax dollars and resources to serve the agenda of those who want to stoke fear and divide us**. https://www.nyclu.org/en/campaigns/new-york-act-all last visited 4/2/2022. [Emphasis added]

Paragraphs 94 through 140 in a subtle and furtive way, makes it even more likely to happen, than not. Plaintiff alleges his experiences parallel the sentiments of Justice Frankfurter, dissenting in *Shaughnessy, district director of immigration and naturalization, v. United States ex rel. Mezei* (1953) when he stated, "Since we proclaimed him a Samson who might pull down the pillars of our temple, we should not be surprised if peoples less prosperous, less strongly established and less stable feared to take him off our timorous hands. With something of a record as an unwanted man, neither his efforts nor those of the United States Government any longer promise to find him an abiding place." Plaintiff asserts that the United States is the most powerful nation in the world – for a nation with such power, it would take very little to furtively isolate an individual, for the purposes of arbitrarily and unreasonably depriving the individual of life, liberty, and property without due process of law. Plaintiff alleges that this is the exact situation Plaintiff is in and understands from actual experience the sentiments of Justice Frankfurter in this paragraph.

143)    Plaintiff believes that the context in which the Courts have discussed "through-the-wall" and "aerial" x-ray surveillance technology (See Footnote 3), has mostly involved intrusions to privacy. Plaintiff believes that such technologies can be weaponized against an individual to cause extreme pain, discomfort, and humiliation, for the purposes of depriving an individual his civil and Constitutional rights – as is the case in Plaintiff's circumstances.

144)    The circumstances described in Paragraphs 94 through 143, created nonpareil extreme living and learning environments, for Plaintiff, where Plaintiff could not retreat to the walls of his apartment for safety, or a place of public accommodation (the library) or his classes.

145)    The activities of Defendants caused Plaintiff daily excruciating physical pain and discomfort, and caused Plaintiff to suffer substantial emotional distress from fear of physical injury, serious physical injury, or death.

146)    As a consequence of the extreme hostile environment at the University of New Orleans, created by Defendants acting under color of federal and state law, on 11/10/2021, Plaintiff notified the University that he would be withdrawing from the PhD program (Exhibit 6). Plaintiff believes that any reasonable person, going through such an extremely traumatizing experience, as described in Paragraphs 94 through 145, would come to the same conclusion.

147)    On or around 11/14/2021, Plaintiff returned to New York where he hoped to get some legal help with the extremely challenging circumstances he was facing.

148)    Plaintiff alleges that the actions of Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, John Doe 4, Neal Maroney, were a direct and proximate cause for Plaintiff's injuries while at the University of New Orleans.

## [Part 5] November 2021: Plaintiff returns to New York for help.

**Defendants: John Doe 1, Unknown federal agents, John Doe 2, and Jane Doe 1**

149)    Plaintiff alleges that when he returned to New York, he spent almost a week sleeping in his car, because of the trauma and fear from Plaintiff's experience at the University of New Orleans when Plaintiff was surrounded from adjacent apartments by Defendants John Doe 1 and Unknown federal agents, acting under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies to target Plaintiff with ionizing radiation.

150)    Plaintiff alleges that Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies tracked and followed Plaintiff back to New York. Plaintiff alleges that

Defendants followed Plaintiff at locations where Plaintiff spent the time sleeping in his car. Plaintiff alleges that Defendants would sometimes scream at Plaintiff from an unmarked Police vehicle, saying "get out of here."

151)   Plaintiff eventually sought temporary housing with the City of New York at Pamoja House Linden Annex 714 S Conduit St Brooklyn NY 11208.

152)   Plaintiff alleges that Defendants John Doe 1 and Unknown federal agents, acting under color of law, including Defendants John Doe 2, and Jane Doe 1, and their proxies tracked and followed Plaintiff to the address noted in Paragraph 151 above and gained access to the building, which at the time was made up of two floors, the first floor was a commercial hotel, and the second floor was temporary housing under the City of New York.

153)   Plaintiff alleges that Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1 and their proxies were located in rooms on the first floor and directly below Plaintiff's room.

154)   On 11/15/2021, Plaintiff alleges hearing Defendant John Doe 1, from the hallway on the second floor say "I'm about to fuck him up," intimating at the use of surveillance equipment to inflict pain on Plaintiff. Defendant John Doe 1, would go on saying, "he needs to know that this ends here," and "we've got him right where we need him."

155)   On 11/16/2021, Plaintiff alleges hearing Defendant John Doe 1, from the hallway on the second floor say, "it's time to go home before you get fucked up."

156)   On 11/18/2021, Plaintiff alleges hearing a conversation among the director of the facility, saying, "they will get him out." To which an unknown individual replied saying "it's so sad right, he should just go home."

157)    Later that same day, 11/18/2021, Plaintiff alleges hearing John Doe 1, saying "he's got to go," "he is a weird guy." To which Defendant Jane Doe 1 responded saying, "he is stuck." Possibly intimating at the fact that Plaintiff was in temporary housing, and had nowhere else to go for help.

158)    Plaintiff alleges that since the beginning of the use of ionizing radiation, while at the University of New Orleans, as a means of inflicting pain, discomfort, and humiliation on Plaintiff, the cruel, unusual, and inhumane practice had substantially escalated in New York. On or around 11/21/2021, Plaintiff alleges hearing Defendant John Doe 1 saying, "I should have started with this," intimating at the suggestion that Defendants should have started with the use of surveillance equipment to direct ionizing radiation at Plaintiff for the period between April 2020 and May 2021 when Defendants engaged mostly in tracking, following, surveilling, and verbally harassing Plaintiff. Defendant John Doe 1 then said, "open him up," right before Plaintiff started experiencing symptoms consistent with radiation exposure. Plaintiff alleges that the comment "open him up," by Defendant John Doe 1 meant that Defendants directed concentrated ionizing radiation at Plaintiff to reveal internal body organs. Additionally, the comment is consistent with the allegations Plaintiff makes in Paragraph 128.

159)    Plaintiff alleges he tried to reach out to the program director at the facility noted in Paragraph 151 about the presence of Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies at the facility. But the response Plaintiff got was one of feigning ignorance. Plaintiff alleges that staff at the same facility, back in January 2021 knew Plaintiff was been tracked and followed when they said things such as, "it's crazy they are on him like that," and a different staff member joked saying, "he is getting a transfer abroad," intimating at the suggestion that Defendants were indeed using advanced surveillance on

Plaintiff and that the aesthetics of it, made people believe Defendants' allegations about Plaintiff being deported were probably true. When the truth was that Defendants had abused federal authority for the purposes of depriving Plaintiff equal protection of the laws in order to harass and intimidate Plaintiff into leaving the United States without appropriate due process of law.

160)    On 11/24/2021, Plaintiff alleges hearing Defendant John Doe 1 say, "fire it up," "I don't give a fuck." Plaintiff alleges that Defendants had become excessively reliant on using ionizing radiation at Plaintiff. Plaintiff alleges feeling excruciating pain, and substantial discomfort each time he was targeted in such a manner. In addition, Defendants would start aiming the radiation at Plaintiff's abdomen and private regions as a way to inflict extreme pain, and perhaps to try to induce involuntary bowel movements, in order to humiliate Plaintiff. Plaintiff asserts that such conduct, by federal agents, under color of law, was not only extremely painful and humiliating, but was, at its essence, dehumanizing.

161)    On 11/25/2021 Plaintiff checked into the emergency room at the Kings County Hospital on Clarkson Avenue in Brooklyn New York, because Plaintiff had been targeted the night before and much of the early morning with what Plaintiff alleges was ionizing radiation. Plaintiff alleges that he experienced excruciating headaches and nerve pain, throughout the night and much of the morning of 11/25/2021.

162)    Plaintiff alleges that he was tracked, and followed at the emergency room at Kings County Hospital in Brooklyn. Plaintiff believes that Defendants may have been trying to prevent Plaintiff from knowing any injuries Plaintiff sustained from being targeted in the forms described in the preceding Paragraphs. Plaintiff alleges feeling helpless knowing that the

independence of medical professionals could be influenced in a way that could deny Plaintiff proper and sufficient healthcare services.

163)     On or around 12/03/2021, Plaintiff alleges hearing Defendant John Doe 1 shout, "he is not gonna go and so we just have to contain him." Plaintiff alleges that such a comment implied that Defendants intended to indefinitely abuse federal authority for the purposes of creating hostile living environments for Plaintiff. Plaintiff alleges that Defendants had no probable cause to engage in such activities.

164)     In addition to the daily harassment and violence toward Plaintiff, by Defendants John Doe 1 and Unknown federal agents acting under color of federal law, including Defendants John Doe 2, Jane Doe 1 and their proxies "riding-along" demonizing and defaming Plaintiff, there was the issue of living conditions in the temporary housing facility. Plaintiff alleges that at the facility noted in Paragraph 151, residents were assigned to two people per room.

165)     Plaintiff alleges that his first roommate, appeared to have been struggling with substance abuse. Plaintiff asserts that this roommate would use what appeared to be illicit drugs in the room, several times a day, and sometimes into the late hours of the night, such that Plaintiff experienced substantial emotional distress from having to breathe the second-hand smoke while Plaintiff was sleeping.

166)     Plaintiff asserts that he does not use illicit drugs. As such, being placed in a room with an individual who used illicit drugs was an overwhelming challenge for Plaintiff.

167)     Additionally, Plaintiff alleges that the City of New York prohibits smoking and illicit drug use within temporary housing facilities. Plaintiff alleges that the rules and regulations regarding smoking and illicit drug use within the facility are 1) explained to a client at the time

of intake, 2) written down in a "client rights and responsibilities" information packet that is given to a client at the time of intake, and 3) are posted in several locations within the facility.

168) Plaintiff alleges feeling extremely concerned about second-hand exposure to illicit drugs, especially in a tight space such as a hotel room. Plaintiff alleges waking up several times during his sleep to leave the room whenever the roommate was smoking illicit drugs.

169) Plaintiff alleges that he tried to ask his roommate to smoke by the window, and/or give Plaintiff some advance notice so that Plaintiff could leave the room. Plaintiff alleges that the roommate, was cooperative at first, for a day or two, but then reverted back to smoking illicit drugs at random times, without notice to Plaintiff.

170) Plaintiff asserts that he brought up the issue with his case manager on two occasions to request a room reassignment; and on both occasions the case manager said that smoking and illicit drug use, within the facility, was something Plaintiff should have expected coming into temporary housing. And that if Plaintiff were to be reassigned Plaintiff would most likely end up in the same circumstances, because of the pervasive nature of this problem.

171) Plaintiff re-alleges that the City of New York has clearly described rules prohibiting smoking and illicit drug use withing the facility. And that a lack of enforcement, creates health and safety risks for individuals within the facility, and the surrounding community.

172) On or around 11/29/2021, the roommate had a meltdown, during which he screamed many things at Plaintiff including threatening Plaintiff, screaming "I will cut you!" Plaintiff further alleges that staff and security were there to witness the roommate's behavior, including the threat toward Plaintiff.

173) Later that same day when Plaintiff returned to the facility, he had hoped that for safety reasons he would be reassigned to a different room. Plaintiff alleges that the reassignment had

not been made and that Plaintiff was expected to return to the same room, where Plaintiff's roommate had threatened to "cut" Plaintiff.

174)   Plaintiff alleges that he explained to a female staff, the same one who had witnessed the threat against Plaintiff, that having Plaintiff return to the same room where he had been threatened, by a roommate, with an apparent substance abuse issue, that he would "cut" Plaintiff, exhibited negligence and reckless indifference toward Plaintiff's safety.

175)   Plaintiff alleges that the staff explained to Plaintiff that an email regarding the incident had been sent out and was waiting to hear back about the room change. Plaintiff explained that he would wait in the lounge until the room reassignment was made. A little, while later, Plaintiff was reassigned to a different room.

176)   Plaintiff alleges that the second roommate seemed to also have been struggling with addiction. Plaintiff alleges that he asked the second roommate what substances the second roommate used, and the second roommate answered saying that he smoked cannabis mixed with crack cocaine.

177)   Plaintiff alleges feeling dismayed at the fact that, because of lack of enforcement of smoking and illicit drug use within the facility, that he would be subjected to mind altering substances clearly harmful to the health and socioeconomic wellbeing of most individuals who indulge in use of such illicit substances.

178)   Plaintiff alleges that he explained to the second roommate that he asked to be reassigned because the first roommate would smoke illicit drugs in the room. The second roommate replied to the effect that he knew about Plaintiff's first roommate and added that he, the second roommate, had overheard staff make negative comments regarding Plaintiff. When Plaintiff

asked exactly what comments were made and/or who made them, the second roommate refused to divulge the exact details, and instead just said, "they must not like you a lot here."

179)    Plaintiff alleges that in addition to health risks from exposure to second-hand smoke from illicit substances, Plaintiff was constantly sprayed with ionizing radiation by federal agents, acting under color of law. Plaintiff asserts that such conditions caused Plaintiff daily excruciating physical pain, and substantial emotional distress, and were extremely traumatizing. Plaintiff alleges that staff were made aware several times regarding Plaintiff's roommates' smoking and illicit drug use within the facility, including when Plaintiff was threatened as a direct consequence of such conditions. However, staff showed reluctance to enforce the rules, and showed reckless indifference towards Plaintiff's health risks and physical safety. Plaintiff alleges that he believed that some, if not all, social service workers, at this and subsequent temporary housing facilities were aware of the activities of Defendants John Doe 1 and Unknown federal agents, acting under color of law, subjecting Plaintiff to cruel, unusual, and inhumane treatment.

180)    Plaintiff alleges that he did not need to be in temporary housing, and that if it were up to Plaintiff's druthers, he would be pursuing his PhD program in New Orleans for his own benefit, and for the benefit of the United States. Additionally, Plaintiff had been granted his permanent residence and as such could finally find long-term gainful employment. However, Defendants John Doe 1 and Unknown federal agents, acting under color of law, including Defendants John Doe 2 and Jane Doe1, and their proxies, were determined to deny Plaintiff the privileges and benefits that come with permanent residence. Defendants deliberately engaged in unlawful conduct designed to deny Plaintiff his civil and Constitutional rights.

**181)**     Plaintiff alleges that the actions of Defendants John Doe 1 and Unknown federal agents, acting within the scope of federal law, including Defendants John Doe 2 and Jane Doe 1, and their proxies were the direct and proximate cause for Plaintiff's exposure to second hand smoke from illicit drugs and by extension the threat of bodily injury to Plaintiff, when the first roommate threatened Plaintiff saying, "I will cut you." Plaintiff alleges that he experienced substantial emotional distress and fear for his life.

**182)**     On 12/09/2021, Plaintiff was given a notice of transfer to the Boulevard Men's Residence BRC, 2027 Lexington Avenue, New York, NY 10035. The notice stated "safety" as the reason for the transfer and did not provide any other details except the one word "safety."

**183)**     Plaintiff accepted to avoid continued exposure to second hand smoke from illicit drug use by the second roommate and to be out of sight of the first roommate who threatened to physically injure Plaintiff.

**184)**     Plaintiff alleges that at the time of the transfer, Plaintiff was not told, and was not aware that the facility referenced in Paragraph 182 was a mental health, and substance abuse facility. Additionally, Plaintiff did not expect, he would be transferred from a general population facility to a mental health and substance abuse facility.

**185)**     Plaintiff alleges that the comment by Defendant John Doe 1 when he said, "we've got him where we need him" alleged in Paragraph 154, suggests that Defendants John Doe 1 and Unknown federal agents, acting under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies conspired with social service workers within NYC DHS, to get Plaintiff transferred to a mental health and substance abuse facility to make it seem as if Plaintiff was suffering from mental illness, perhaps in order to discredit Plaintiff's allegations against Defendants.

**186)**    Plaintiff alleges that a pattern seemed to have been formed at this and every subsequent temporary housing facility Plaintiff would be transferred to. It appeared that Defendants John Doe 1 and Unknown federal agents, functioning under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies relied on federal authority to influence, not only social service workers for NYC DHS, within the facilities, but the clients as well. The outcome for Plaintiff seemed to have started forming a pattern; Plaintiff experienced subtle, and sometimes blatant disparate treatment from staff. Staff feigned ignorance regarding the activities of Defendants John Doe 1 and Unknown federal agents, functioning under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies.

**187)**    In addition, Plaintiff alleges he was tracked, and followed to covid-19 isolation hotels. On 12/09/2021, after reporting a high fever, Plaintiff was sent to a Covid-19 isolation hotel at TownePlace Suites 38-42 11th St, Long Island City, NY 11101, where Defendants, acting under color of law, tracked, followed, surveilled, and continued to subjected Plaintiff to ionizing radiation. On or around 1/16/2022, after a different client tested positive for Covid-19, everyone in the dorm had to be sent to quarantine. Plaintiff was sent to the Brewer isolation hotel at 47-05 Guy R Brewer Blvd, Jamaica, NY 11434. Plaintiff was tracked and followed by Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies.

**188)**    Plaintiff alleges that while in isolation, on or around 1/19/2022, Plaintiff alleges hearing Defendant John Doe 1 saying "we need to hit him really hard," intimating at the use of ionizing radiation to cause Plaintiff pain and discomfort. Plaintiff alleges that Defendants targeted Plaintiff with concentrated ionizing radiation to the extent that the pain from being targeted in such a manner was so unbearable that Plaintiff complained to a male shift supervisor. A short while later, a group of NYPD officers, arrived with EMS asking to see Plaintiff. The officers

insisted that Plaintiff be taken to psych emergency clinic. Plaintiff alleges that he did not resist and was driven to a hospital close by. Plaintiff alleges that he was asked to wait at the reception area to the psychiatric emergency clinic. Plaintiff sat there for what appeared to be close to an hour and a half or so. Plaintiff alleges that during a conversation with a Doctor, Plaintiff was asked how he felt, to which Plaintiff responded he was having a really bad headache. Plaintiff was given a pain killer, acetaminophen 650 mg, and shortly after was released. The Doctor explained that after monitoring Plaintiff he did not find anything psychiatrically wrong with Plaintiff.

189)   Plaintiff alleges that the incident at the Covid isolation site, described in Paragraph 188, was not isolated or random. Plaintiff alleges that Defendants John Doe 1 and Unknown federal agents, acting under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies, were influencing social service workers against Plaintiff, to among other things, advance a false narrative that Plaintiff had a mental illness, which included Defendants' need to create a record of "psychiatric incidents" to substantiate such a claim. cruel.

190)   Plaintiff alleges that he was informed that one of the requirements at the facility noted in Paragraph 182 was to attend a psych evaluation. On 12/29/2021 Plaintiff attended a psych evaluation with Defendant Susan Brady. During the meeting, which lasted about an hour and 45 minutes or so, Plaintiff was asked why Plaintiff was in temporary housing.

191)   In Paragraph 181 Plaintiff asserts that he did not need to be in temporary housing, because Plaintiff was enrolled as a PhD candidate pursuing his academic dreams, and additionally, Plaintiff had been granted permanent residence which meant that Plaintiff could finally engage in long-term gainful employment. However, because of the actions of Defendants John Doe 1 and Unknown federal agents, acting under color of law, including Defendants John Doe 2 and

Jane Doe 1, and their proxies, tracking, following, surveilling, and harassing Plaintiff including severely demonizing and defaming Plaintiff, alleging among other things, that Plaintiff was getting deported, created restrictive socioeconomic barriers that prevented, or at least made it extremely difficult for Plaintiff to pursue his education and employment goals.

192)    Additionally, Plaintiff explained to Defendant Susan Brady that he had been tracked and followed by Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies at the facility. Plaintiff asserts that one of the City of New York's guidelines for helping individuals in temporary housing states the following, "You must cooperate to determine available resources, and apply for and use any benefits and resources that will reduce or eliminate the need for shelter.."(Exhibit 15) Plaintiff hoped that by explaining the reasons why he was in temporary housing would help staff identify the illegal immigration pursuit as the barrier in Plaintiff's current circumstances, and begin the process of addressing it.

193)    Plaintiff upon explaining the circumstances delineated in Paragraphs 191 through 192, toward the end of the meeting Defendant Susan Brady seemed to intimate that she didn't see anything wrong with Plaintiff, except that she felt Plaintiff needed to get some therapy. Defendant's exact words were "I think you're fine." And recommended therapy due to the bias incidents from Defendants John Doe 2 and Jane Doe 1 that started when Plaintiff lived at New Paltz Gardens Apartments.

194)    On or around 01/05/2022, Plaintiff was informed by his case manager that Defendant Susan Brady had diagnosed Plaintiff with schizophrenia. Plaintiff asserts that he was shocked, surprised and dismayed at the diagnosis. Defendant Susan Brady, had not mentioned anything to Plaintiff, nor was there any follow up with Plaintiff. Plaintiff alleges that the circumstances around the diagnosis, were a little strange, and clearly negligent at the very least.

**195)**    Plaintiff asserts that he has no history of mental illness, additionally, there is no history of

mental illness in Plaintiff's family. Plaintiff alleges that he asked the case manager if he could

request a copy of the diagnosis and any other information used in making such a diagnosis.

Plaintiff informed the case manager that he did not agree with the diagnosis.

**196)**    On or around 2/1/2022, Plaintiff requested records, of Defendant Susan Brady's diagnosis

pursuant to the rules and regulations of the facility. Plaintiff alleges that he was asked to speak

to several staff members, including the program director, as an administrative process prior to

releasing the records. On or around 2/14/2022 Plaintiff was provided a copy of the diagnosis

and accompanying notes explaining the basis of the diagnosis.

**197)**    Upon examining the Defendant Susan Brady's rationale for the diagnosis, Plaintiff alleges

that Defendant Susan Brady, did not undertake to perform adequate due diligence before

arriving at a clearly inadequately informed and subjective conclusion. Furthermore, Defendant

Susan Brady seemed to have deviated from professional standards in arriving at her decision.

**198)**    Plaintiff alleges that Defendant Susan Brady, was more likely than not influenced by

Defendants John Doe 1 and Unknown federal agents, acting under color of law, to diagnose

Plaintiff with a condition that is clearly untrue for Plaintiff, appearing to be more punitive than

benignant, and clearly intended to, 1) discredit Plaintiff's claims of being tracked, followed

and surveilled, and 2) manufacture aggravating factors that could be used to deny Plaintiff a

future benefit that Plaintiff would otherwise qualify for, such as adjusting from permanent

residence to citizenship.

**199)**    Additionally, it is not a stretch to ratiocinate that in the present, such a misdiagnosis, can

limit Plaintiff's socioeconomic opportunities. An example is that when an individual has no

where else to go and needs temporary housing for the short-term, a mental health diagnosis has

the effect of confining an individual to a mental health and substance abuse facility, where an individual will most likely be exposed to second-hand smoke from illicit substances, such that protracted exposure can alter the health and productivity of the individual.

200)    Plaintiff alleges that when federal agents, exert federal authority, for the purposes of arbitrarily and randomly denying a person civil and constitutional protections, and individuals such as social service workers, among others, acquiesce with the federal agents, it has created an extremely hostile environment for Plaintiff, that encouraged staff to engage in subtle and/or blatant disparate treatment of Plaintiff.

201)    On or around 12/23/2021, Defendant John Doe 6, while escorting Plaintiff to his dorm, was on facetime, and on loud speaker, with unknown individuals, Plaintiff believed were Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies.

202)    Plaintiff noticed Defendant John Doe 6 attempting to angle his phone so as to get Plaintiff in the frame of Defendant John Doe 6's phone camera. When Defendant finally got Plaintiff in the frame of the phone camera, the unknown individuals on the other end exclaimed, "weird guy." Plaintiff asserts that "weird guy" was one of the phrases used by Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies used to describe Plaintiff.

203)    Plaintiff alleges that when Defendant John Doe 6 used his phone to record Plaintiff within the facility, without Plaintiff's consent was an invasion of Plaintiff's reasonable expectation of privacy.

204)    On or around 2/16/2022 Plaintiff asserts that he filed a notice of claim with the City of New York, for state claims alleging, among other things, negligence in lack of enforcement of crucial rules such smoking and illicit drug use within the facility, including negligence in Defendant Susan Brady's diagnosis.

**205)**    On or around 3/6/2022 Plaintiff was transferred to a general population temporary housing facility at Help 107 on 237W 107th St, NY 10025.

**206)**    Plaintiff alleges that up until this time, he had observed Defendants engaging in conduct to manufacture false evidence against Plaintiff by exerting federal authority to influence social service workers against Plaintiff.

**207)**    Between May and June 2022, while Plaintiff was getting some food in the dining hall, a staff member at the facility, who appeared to be a cook, held up his phone and angled it in such a way as to get Plaintiff in the frame and took a selfie picture with Plaintiff in it, without Plaintiff's consent. Plaintiff asserts that he told the individual that Plaintiff did not want to be in his picture, to which the individual simply replied "yeah," put his phone away and proceeded to serve Plaintiff some food.

**208)**    Plaintiff alleges that the cook's action to intentionally take a picture of Plaintiff without the consent of Plaintiff, invaded Plaintiff's right to privacy.

**209)**    Shortly after the incident with the cook invading Plaintiff's privacy, the cook remarked "they need to run him down." As if to intimate that Defendants John Doe 1 and Unknown federal agents, acting within the scope of federal law, including Defendants, John Doe 2 and Jane Doe 1, and their proxies, needed to continue harassing Plaintiff to the point of extremely exhausting Plaintiff physically, and emotionally.

**210)**    Plaintiff has reasonable cause to believe that the cook had been engaged by Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies. Or may have been a spy Otherwise, why choose to randomly target Plaintiff with such an invasive action. In any case, Plaintiff's expectation of reasonable privacy at Help 107, was invaded by the cook's action.

**211)**     On or around the beginning of June 2022, Plaintiff asserts that he was informed that the facility, at the address noted in Paragraph 206 would be shutting down on or around 6/22/2022, and that clients would be reassigned to different facilities.

**212)**     On or around 6/12/2022, Plaintiff alleges that he was asked to meet with his case manager about Plaintiff's transfer to a different facility. Plaintiff was informed that he would be transferred to the Bronx at JAMS on 3600 Jarome Avenue, Bronx NY 10467. Plaintiff alleges that he was asked if Plaintiff accepted the transfer or not. Plaintiff asserts that he needed a little time to look it up and find out a little more about the facility before making a decision.

**213)**     Plaintiff asserts that upon finding out that the facility to which Plaintiff was intended to transfer was a mental health and substance abuse facility, Plaintiff informed the case manager that he refused to accept that assignment, and noted that the notice of transfer (Exhibit 16), given to Plaintiff, entitled Plaintiff to a supervisory review, of which Plaintiff hoped would state the reasons why Plaintiff would be transferred from a general population to mental health and substance abuse facility. Plaintiff had concerns that some staff, social service workers in the NYC DHS, had been working with Defendants John Doe 1 and Unknown federal agents, acting under color of law to advance a false narrative that Plaintiff had a mental health issue by manufacturing a record of transfers to such facilities to give credence to that false narrative.

**214)**     Plaintiff alleges that the review was not done, and later that night Plaintiff was informed by a night shift supervisor that he was transferred and that if Plaintiff refused to leave, Plaintiff would be trespassing and that NYPD officers would be called on Plaintiff to forcibly remove Plaintiff from the building.

**215)**     Plaintiff alleges that he informed the supervisor that the transfer notice explicitly stated Plaintiff had the option to deny the assignment and to request a supervisory review.

Additionally, Plaintiff alleges that he informed the shift supervisor at the facility that the transfer notice appeared to be defective.

216)    At or around 6/12/2022, about four NYPD officers appeared at the facility and asked Plaintiff to leave. The shift supervisor followed the officers to Plaintiff's room and handed them additional documentation that highlighted a section showing that Plaintiff's current assigned facility was JAMS at 3600 Jarome Avenue in the Bronx. Plaintiff believes that this action seemed to be an attempt by the shift supervisor to make the case that Plaintiff was trespassing.

217)    Plaintiff explained to the officers the same information he had explained to the shift supervisor earlier, that the notice of transfer furnished to Plaintiff, gave Plaintiff the option to deny the assignment and request a supervisory review. Additionally, Plaintiff pointed out the defect on the notice of transfer to the officers.  Upon hearing Plaintiff's reasons, the officers suggested Plaintiff should follow up with the case manager the following day, and left without removing Plaintiff.

218)    Plaintiff alleges that the use of force, calling NYPD, to remove clients without due process is a common practice within the Department of Homeless Services for the City of New York.

219)    The Federal Bureau of Investigation (FBI) defines use of force in part as "The breadth and scope of the use of force is vast—from just the physical presence of the officer to the use of deadly force." https://www.fbi.gov/investigate/civil-rights

220)    Plaintiff alleges that he had nowhere else to go, as such, on or around 6/13/2022, Plaintiff arrived at JAMS 3600 Jarome Avenue, Bronx, NY 10467. Plaintiff observed that he had been tracked and followed by Defendants John Doe 1 and Unknown federal agents, acting within

the scope of their employment, including Defendants John Doe 2 and Jane Doe 1, and their proxies.

221)    Plaintiff asserts that he observed that there were about 12 individuals in the dorm, with almost all of them liberally smoking and engaging in what appeared to be the use of illicit drugs. (Exhibits 17 and 18)

222)    Plaintiff asserts that the next day, Plaintiff left and decided to sleep in his car, in order to avoid the conditions noted in Paragraph 222, while trying to get a reassignment. Plaintiff asserts that it was difficult for him, as someone who does not engage in substance abuse, to voluntarily go into a place where Plaintiff would be exposed to second hand smoke from illicit substances. Plaintiff asserts that he ended up spending close to two weeks in his car. Plaintiff asserts that sleeping in the car presented unique challenges, both sanitary and safety. As such, Plaintiff decided to go back for sanitary reasons, and to only spend as little time as possible inside the facility.

223)    Plaintiff alleges that upon information, he was transferred to 4380 Bronx Blvd, NY 10466

224)    Plaintiff observed that living conditions at the facility noted in Paragraph 224 were much worse than those at the previous facility.

225)    Plaintiff observed that there were about 29 residents in the dorm, with most of them liberally smoking and engaging in what appeared to be illicit drug use. Plaintiff alleges that smoking within the facility and the use of illicit substances was around the clock, at least for the time that Plaintiff was inside the building (Exhibits 19 through 23). Plaintiff alleges that clients would smoke individually and sometimes gathered in groups. Plaintiff also observed a severe lack of enforcement of rules against smoking and illicit drug use within the facility; a sentiment that one of the staff members brought up during Plaintiff's intake.

226)    Plaintiff alleges that he could not bring himself to stay, and decided to sleep in his car instead. Plaintiff spent about a week in his car. Plaintiff alleges that this was equally challenging, such that it made Plaintiff decide once again to return to the facility and only spend as little time as possible inside the facility.

227)    Plaintiff alleges that such conditions, as observed at JAMS 3600 Jarome Avenue, Bronx NY and Ana's Place 4380 Bronx Blvd, Bronx NY, would reasonably end up doing more harm than good, especially to individuals who did not engage in illicit drug use. Plaintiff alleges that such environments created substantial health risks to individuals within the facilities, and by extension, created a public health crisis in the communities where such facilities are located, as a direct consequence of lack of enforcement of the rules regarding smoking and illicit drug use within the facilities. (Exhibits 17 through 23).

228)    Plaintiff alleges that he felt morally obligated to document such conditions (Exhibits 17 through 23), and bring some awareness (via state civil complaint) to conditions that Plaintiff believed presented insidious health and physical safety risks to clients and staff alike, within the facilities, and by extension, appeared to be a public health concern, in the communities in which the facilities are located.

229)    Plaintiff alleges that there have been many incidents indicating the influence of Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies over social service workers at the temporary housing facilities Plaintiff resided. For example, Defendant John Doe 6 video recording Plaintiff on facetime, alleged in Paragraphs 201 through 203, and another incident when Plaintiff accidentally called BRC, thinking he was calling Kings County Hospital, and the person at BRC who picked up, and said "sad guy," as if to confirm that it was Plaintiff who had called.

230)    Plaintiff has been severely targeted with what appears to be ionizing radiation by Defendants claiming federal authority, for a protracted period starting around August 2021 to September 2022. Plaintiff believes that alleging that the government is capable of such violence is not something that people usually talk about, and may seem a little bit out there. But the fact is that the government does have that ability (Exhibits 11A, 11B, 12A, 12B, 13 and 14). Plaintiff alleges that his experience with having been targeted with ionizing radiation has been an extremely traumatizing experience; Plaintiff alleges that it is truly cruel, unusual, and inhumane, for the government and its proxies to furtively engage in such methods of enforcement, without probable cause. It induces excruciating pain and discomfort, and there is literally no place Plaintiff can retreat to for safety.

231)    Plaintiff alleges that he believes the courts have not had many opportunities to hear of cases alleging federal agents weaponizing surveillance equipment, including using ionizing radiation, for the purposes of inflicting pain and discomfort and creating hostile environments for an individual, designed to deny that individual civil and constitutional protections, in order to provoke that individual into some socially unfavorable reaction, and or to create harsh and restrictive socioeconomic circumstances for that individual in order to advance a false narrative of that person, and if that individual were an immigrant, in order to create extremely harsh living conditions in order to run that individual out of the country without appropriate due process.

232)    Plaintiff alleges the actions of Defendants John Doe 1, and Unknown federal agents, acting under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies, have created unbearable hostile conditions for Plaintiff, as described in Paragraph 231, including environments where Plaintiff continually gets exposed to second-hand smoke from illicit

substances. Additionally, Defendants abusing federal authority to influence social service workers, and other professionals ensures promulgation of the false narrative that Plaintiff is experiencing these conditions because of mental illness. A claim that would not stand when applied to objective standards.

233)    Additionally, Plaintiff alleges that when federal agents and their proxies engage in violations of Constitutional liberties, in cruel, unusual, and inhumane ways, such as described in Paragraphs 231, 232 and several others throughout this complaint, it would make sense that federal agents and their proxies would resort to extreme and outrageous methods to cover up, including but not limited to using psychological warfare, in order to discredit allegations of claimant. These allegations are serious, as such Plaintiff looks to the Court for relief that clearly Plaintiff cannot get anywhere else.

234)    Plaintiff beseeches the judge to consider that history has shown that most times, it takes the tragedy of someone, to secure the liberties of many others. Plaintiff's case, is one such example with Constitutional implications for the American public in general, but especially immigrant communities, who might be targeted by the government in subtle ways, to force them to leave their new home, without appropriate due process: Plaintiff beseeches the Judge to consider the following:

1.   When Plaintiff moved into his apartment in New Paltz, NY, September 2019, some of his neighbors felt uncomfortable Plaintiff had moved into the building. The way they chose to deal with that was to be hostile toward Plaintiff, and in their ignorance, chose to target Plaintiff with xenophobia and racial animus. Which all, somehow reified into a strange obsession to make Plaintiff uncomfortable to force Plaintiff to move from his apartment. Plaintiff believes that they probed into his past and discovered Plaintiff was

going through the immigration process. Their fixation with Plaintiff turned into efforts to get Plaintiff's petition for permanent residence denied. Plaintiff asserts that Defendants John Doe 1, and Unknown federal agents were engaged for the purpose of preventing the approval of Plaintiff's petition for permanent residence. On May 21, 2021 Plaintiff's petition for permanent residence was approved by the United States Citizenship and Immigration Services (USCIS).

2. Defendants turned to harassment and subtle forms of violence to try to run Plaintiff out of the country. For about 29 months to date, Plaintiff has endured hostile environment after hostile environment, from about April 2020 to September 2022; during which Plaintiff was tracked, followed, surveilled and harassed from New York to New Orleans and then back again, by Defendants John Doe 1 and Unknown federal agents, acting withing the scope of their federal employment, alleging that Plaintiff would be denied his petition for permanent residence and would be deported.

3. At all times relevant to this complaint, Plaintiff asserts that as an individual within the jurisdiction of the United States, and as a permanent legal resident, Plaintiff was entitled to equal protection of the laws. Plaintiff alleges that when Defendants John Doe 1 and Unknown federal agents, acting within the scope of their federal employment, decided to keep tracking, following, surveilling, and harassing Plaintiff, for the purposes of running Plaintiff out of the United States, even after Plaintiff was lawfully granted permanent residence, was a violation of Plaintiff's Due Process right of the Fifth Amendment to the Constitution of the United States, and the Equal Protection of the Laws implied in the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

4. Additionally, Plaintiff alleges that Defendants had no probable cause to continue tracking, following, surveilling, and harassing Plaintiff. Plaintiff alleges that when Defendants continued tracking, following, surveilling, and harassing Plaintiff, Defendants John Doe 1 and Unknown federal agents violated Plaintiff's privacy under the Fourth Amendment to the Constitution of the United States.

5. Starting around mid-August 2021, Plaintiff would have reason to believe Defendants John Doe 1, and Unknown federal agents, acting under the scope of their federal employment were using through-the-wall x-ray surveillance equipment and perhaps aerial surveillance to monitor Plaintiff within his apartment, at the university library, and while Plaintiff was attending his classes.

6. Plaintiff alleges that the aesthetics of the presence of federal agents, Defendants John Doe 1 and Unknown federal agents, and other individuals, Defendants John Doe 2, Jane Doe 1, and their proxies, who had tracked and followed Plaintiff from New York to Louisiana, coupled with the use of advanced surveillance, would, to any reasonable person, create in their minds, a sense of an emergency. Additionally, Defendants engaging, under color of law, in peddling unsubstantiated fears about Plaintiff created an urgent sense of emergency, which Plaintiff alleges would reasonably have the effect of Plaintiff's university community viewing Plaintiff as a safety risk rather than as a fellow student.

7. Plaintiff observed and experienced being targeted with ionizing radiation for the purposes of, among other things, causing Plaintiff extreme pain and discomfort to constructively remove Plaintiff from his campus apartment and Plaintiff's PhD program.

8. From mid-August 2021 to September 2022, Defendants, under color of law, continued to target Plaintiff with ionizing radiation, at every subsequent address Plaintiff has moved to. Creating a situation where Plaintiff has no place to go for safety.

9. Defendants' actions, under color of law, to engage in spraying Plaintiff with concentrated ionizing radiation, for the purposes of, among other things, inflicting extreme pain and discomfort, were illegal, improperly motivated, and malicious in nature. The Constitution of the United States, prevents the government, and its proxies from subjecting people to disparate and worse treatment in any situation. Plaintiff alleges that such use of advanced surveillance is fundamentally cruel, unusual, and inhumane. And is clearly a violation of Plaintiff's right to be free from cruel and unusual punishments under the Eighth Amendment to the Constitution of the United States.

10. At all times relevant to this complaint, Plaintiff alleges that Defendants have acted as though Plaintiff's choice of residing in the United States was their decision to make, and have been fixated with harassing and intimidating Plaintiff to forcibly remove Plaintiff from the United States. Defendants John Doe 1 and Unknown federal agents, acting within the scope of their employment, have for almost a year, and counting, targeted Plaintiff with ionizing radiation to cause Plaintiff extreme pain and discomfort in order to run Plaintiff out of the country. Plaintiff asserts that these methods are cruel, unusual, and inhumane.

11. In November 2021, when Plaintiff sought temporary housing as a consequence of Defendants' actions towards Plaintiff, Plaintiff alleges hearing Defendant John Doe 1 shouting "we've got him where we need him." (See Paragraphs 154 and 186). Plaintiff

alleges that Defendants John Doe 1 and Unknown federal agents, acting under color of law, including Defendants John Doe 2 and Jane Doe 1, and their proxies influenced social services workers of the City of New York at the facilities where Plaintiff was receiving temporary housing, to systematically get Plaintiff moved to facilities where Plaintiff's living conditions were unfavorable to individuals such as Plaintiff, who do not engage in the use of illicit drugs (See Paragraphs 149 through 234)

12. Plaintiff alleges that Defendants saying that "we are getting him out," and "we are just waiting for the order," (which Plaintiff understood as an order to arrest Plaintiff for the purposes of deporting Plaintiff), implied that Defendants were low level agents with limited discretionary authority. Plaintiff alleges that Defendants, under color of law, created an echo chamber in which, inter alia, they repeatedly said things like "we caught him," "nobody wants him here," "we are getting him out," created hostile living environments for Plaintiff that encouraged violations of Plaintiff's civil rights and Constitutional liberties.

13. Plaintiff is sustaining injuries every single day, gradually losing economic opportunities, and facing substantial risks to his physical and emotional health. Plaintiff fears suffering permanent health and socioeconomic injuries as a consequence of Defendants continuing to deprive Plaintiff his civil and Constitutional rights.

14. Plaintiff alleges that he has encountered interference from Defendants John Doe 1 and Unknown federal agents, acting within the scope of their federal employment, including Defendants John Doe 2 and Jane Doe 1, and their proxies engaging in tracking, following, surveilling, and harassing Plaintiff, each time Plaintiff has tried to get help. Additionally, Plaintiff has been severely targeted with ionizing radiation

during the time Plaintiff was drafting this complaint. Plaintiff believes such an action was intended to prevent or diminish Plaintiff's ability to seek help from the Court.

15. Plaintiff asserts that his passport expired November 2021, and as such could not "run out of the United States" even if that were an option. Plaintiff alleges he has been trapped in this government and vigilante violence intended to run Plaintiff out of the country. Plaintiff alleges that he feels like he is hanging on to his life, and his dreams by a thread.

16. Justice Sotomayor concurring in *United States v. Jones* (2012), said the following, "Government, in its unfettered discretion, chooses to track—may "alter the relationship between citizen and government in a way that is inimical to democratic society." *United States v. Cuevas-Perez*, 640 F. 3d 272, 285 (CA7 2011) (Flaum, J., concurring). Justice Frankfurter, dissenting in *Shaughnessy, district director of immigration and naturalization, v. United States ex rel. Mezei* (1953) said, "This man, who-seems to have led a life of unrelieved insignificance, must' have been astonished to find himself suddenly putting the Government of the United States in such fear that it was afraid to tell him why it was afraid of him."

17. Plaintiff asserts that he has lived the literal meaning of the assertions by the Justices. Plaintiff went from being an ordinary person, overcoming overwhelming challenges, pursuing his American Dream, as described in Paragraph 8, to literally existing in something of the nature of a Police State within the jurisdiction of the United States; for no legitimate reason, except that Defendants, willfully chose to disregard Plaintiff's lawfully granted legal permanent residence and instead decided to keep harassing, and demonizing Plaintiff to people withing Plaintiff's community, and subjecting Plaintiff,

to subtle forms of violence that are cruel, unusual, and inhumane, for the purpose of "running Plaintiff out of the country."

18. The Fifth Amendment to the Constitution of the United States, in pertinent part reads, "nor shall any person be deprived of life, liberty, or property, without due process of law."

19. Plaintiff alleges that Defendants engaging in forcibly trying to remove Plaintiff from the United States, without probable cause is a gross violation of Plaintiff's Due Process right, and Equal Protection of the laws implied in the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

20. For over 29 months, Plaintiff has done nothing but try to avoid the unprovoked, senseless, and unjustified forms of harassment and violence directed toward Plaintiff as described in the preceding paragraphs. Hoping that Defendants would leave Plaintiff alone[6]. Instead, Defendants have doubled down, intruding into Plaintiff's privacy, interfering with Plaintiff's possessory interest of the Fourth Amendment to the Constitution of the United States, and targeting Plaintiff with cruel, unusual, and inhumane methods of enforcement, such as using ionizing radiation for the purposes of creating hostile environments for Plaintiff, designed to run Plaintiff out of the United States. Plaintiff alleges that he has been shut out of the pursuit of happiness and is currently existing in a quasi-police state within the jurisdiction of the United States,

---

[6] Justice Brandeis, dissenting in *Olmstead v. United States (1928)* explained that "**The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness**. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. **They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone-the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment**." [Emphasis added]

without any legitimate legal, moral, or ethical basis. Except that, Defendants have become excessively obsessed with Plaintiff. Plaintiff alleges that he believes Defendants have made their obsession with Plaintiff personal, and if left to their ways, will indefinitely abuse federal authority to cause Plaintiff irreparable injuries, out of spite.

21. Plaintiff asserts that he came to the United States because the makers of the Constitution undertook to secure conditions favorable to the pursuit of happiness (See Footnote 6), and by so doing securing the promise of the American Dream, based on the premise of equal protection of the laws, and that anyone willing, who gets a fair chance, can excel. Plaintiff throughout his pursuit of happiness, has embraced these ideals, fully investing in the ideals of democracy, self-determination, and economic prosperity. Believing that the returns from such investments would work for the benefit of Plaintiff, and for the benefit of the United States. Plaintiff has reached out to appropriate government agencies for help, but believes the influence of Defendants has been substantial enough to have the government turn a blind eye to Plaintiff's grievances.

22. Plaintiff alleges his experiences parallel the sentiments of Justice Frankfurter, dissenting in *Shaughnessy, district director of immigration and naturalization, v. United States ex rel. Mezei* (1953) when he stated, "Since we proclaimed him a Samson who might pull down the pillars of our temple, we should not be surprised if peoples less prosperous, less strongly established and less stable feared to take him off our timorous hands. With something of a record as an unwanted man, neither his efforts

nor those of the United States Government any longer promise to find him an abiding place."

23. Plaintiff asserts that the United States is the most powerful nation in the world – for a nation with such power, it would take very little to furtively isolate an individual, for the purposes of arbitrarily and unreasonably depriving the individual of life, liberty, and property without due process of law. Plaintiff alleges that this is the exact situation he is in, where federal agents acting under federal color of law continuously abuse their authority to target Plaintiff in cruel, unusual, and inhumane ways. Creating hostile environments everywhere Plaintiff goes for the purposes of denying Plaintiff equal protection of the laws in order to intimidate Plaintiff to leave the United States.

24. Plaintiff asserts that the methods used to target Plaintiff, create a dangerous precedent for immigrant communities, where the government and its proxies can arbitrarily and unreasonably target an individual with, among other things, ionizing radiation – leaving the individual with literally no place to go for safety, for the purposes of creating hostile environments to intentionally violate Fifth Amendment rights, in order to forcibly run immigrants out of the country. Plaintiff alleges that the methods employed on him have been cruel, unusual, and inhumane. Plaintiff alleges that he has been left with nowhere to go for safety, and fears serious permanent physical injuries or even death, from the activities of Defendants acting under color of law.

25. Plaintiff asserts that he has a fundamental right to be left alone. Without this court's interference, Plaintiff fears he will suffer irreparable injuries. Plaintiff is experiencing excruciating physical pain, substantial emotional distress and heightened health risks everyday with no end in sight (Exhibits 11 through 14, and 17 through 23).

## VII.    <u>STATEMENT OF CLAIMS</u>

## CONSTITUTIONAL

**Count I**

**1.1    Unreasonable searches in violation of U.S Constitution, Fourth Amendment**

**1.2    Unreasonable searches in violation of Article I, § 12 of The Constitution of the State of New York**

**1.3    Unreasonable searches in violation of Article I, § 5 of The Constitution of the State of Louisiana**

**Defendants: Unknown federal agents, and John Doe 1**

235)    Plaintiff incorporates by reference the assertions contained in Paragraphs 1 through 234, above, as if fully set forth in this section.

236)    Plaintiff is a legal permanent resident within the jurisdiction of the United States.

237)    As an individual within the jurisdiction of the United States, and as a legal permanent resident, Plaintiff at all times relevant to this complaint was entitled to equal protection of the laws.

238)    At all times relevant to this complaint, Plaintiff had a Constitutional right to be free from unwarranted searches under the Fourth Amendment to the Constitution of the United States.

239)    Defendants, acting under the scope of their federal employment, violated Plaintiff's Constitutionally protected right.

240)    On or around April 2020 Defendants, acting under color of federal law, engaged in tracking, following, and surveilling Plaintiff.

241)    On or around 9/15/2020, Defendants tracked and followed Plaintiff from New Paltz, NY to Poughkeepsie NY.

242)     On or around 12/30/2020, Defendants tracked and followed Plaintiff from Poughkeepsie NY to Brooklyn NY.

243)     On 5/21/2021 the United States Citizenship and Immigration Services (USCIS) approved Plaintiff's petition for permanent residence.

244)     On or around 5/21/2021 Defendants conspired to deprive Plaintiff of benefits, privileges, and responsibilities of permanent residence by continuing to harass Plaintiff in order to run Plaintiff out of the country.

245)     On or around 6/26/2021, Defendants tracked, and followed Plaintiff from New York to Louisiana.

246)     On or around August 2021 Plaintiff would have reasonable cause to believe Defendants used through-the-wall x-ray surveillance equipment, and possibly aerial surveillance to surveil Plaintiff in his university apartment, at the university library, and while Plaintiff attended his classes on campus.

247)     Defendants continued using through-the-wall x-ray equipment, and possibly aerial surveillance to surveil Plaintiff in his university apartment, at the university library, and while Plaintiff attended his classes on campus through November 2021. On 11/10/2021, Plaintiff withdrew from the university.

248)     On or around 11/14/2021 Defendants tracked, and followed Plaintiff from New Orleans back to New York.

249)     On or around November 2021 through September 2022 Defendants continued with the use of through-the-wall x-ray surveillance equipment, and possibly aerial surveillance to surveil Plaintiff everywhere Plaintiff went in New York.

250)    Defendants, acting under color of law, and without probable cause, intentionally deprived Plaintiff his constitutional right to be free from unreasonable searches.

251)    Defendants had no probable cause to track, follow, and surveil Plaintiff for a protracted period from April 2020 to September 2022. Additionally, Defendants lacked probable cause to track, follow, and surveil Plaintiff after Plaintiff's permanent residence was approved on May 21, 2021.

252)    Defendants' actions were the direct and proximate cause of Plaintiff's loss of his Constitutional right.

253)    There is no statutory cause of action that can provide Plaintiff a meaningful remedy for Defendants' continued violations of Plaintiff's Constitutionally protected right to be free from unwarranted searches.

254)    An appropriate remedy, namely damages, can be imposed. Plaintiff seeks compensatory and punitive damages as stated under the prayer for relief.


**Count II**

**2.1 Substantial interference with possessory interest in violation U.S Constitution, Fourth Amendment**

**2.2 Substantial interference with possessory interest in violation of Article I, § 12 of The Constitution of the State of New York**

**2.3 Substantial interference with possessory interest in violation of Article I, § 4(A) of The Constitution of the State of Louisiana**

**Defendants: Unknown federal agents, and John Doe 1**

255)    Plaintiff incorporates by reference the assertions contained in Paragraphs 1 through 254, above, as if fully set forth in this section.

256)    Plaintiff is a legal permanent resident within the jurisdiction of the United States.

257)    As an individual within the jurisdiction of the United States, and as a legal permanent resident, Plaintiff at all times relevant to this complaint was entitled to equal protection of the laws.

258)    At all times relevant to this complaint, Plaintiff had a Constitutional right to be free from unwarranted interference with Plaintiff's use and enjoyment of Plaintiff's property, including his apartment, under the possessory interest of the Fourth Amendment to the Constitution of the United States.

259)    Defendants, acting under the scope of their federal employment, violated Plaintiff's Constitutionally protected right.

260)    On or around April 2020 to September 2022, Defendants, acting under color of federal law, tracked and followed Plaintiff from New York to Louisiana, and then back to New York. During this period, Plaintiff lost his ability to use, and enjoy his property, which has been in storage for most of the period between April 2020 to September 2022. Additionally, as a consequence of the methods of surveillance used by Defendants, Plaintiff lost his reasonable expectation of protections that come with retreating to one's own apartment for safety.

261)    Defendants' actions created a hostile living environment for Plaintiff, such that Plaintiff resorted to storing his property and move several times over the period of April 2020 to September 2022 in order to avoid hostile environments being created by Defendants.

262)    Defendants' actions, under color of law, created hostile living environments for Plaintiff.

263)    Defendants had no probable cause to interfere with Plaintiff's use and enjoyment of his property, including Plaintiff's reasonable expectation of safety from his apartment, for a protracted period from April 2020 to September 2022. Additionally, Defendants lacked probable cause to interfere with Plaintiff's use and enjoyment of his property, including

Plaintiff's reasonable expectation of safety from his apartment after Plaintiff's permanent residence was approved on May 21, 2021.

264) Defendants' actions were the direct and proximate cause of Plaintiff's loss of use and enjoyment of his property, including Plaintiff's reasonable expectation of safety from his apartment.

265) There is no statutory cause of action that can provide Plaintiff a meaningful remedy for Defendants' continued violations of Plaintiff's Constitutionally protected right to be free from interference of his possessory interest guaranteed under the Fourth Amendment to the Constitution of the United States.

266) An appropriate remedy, namely damages, can be imposed. Plaintiff seeks compensatory and punitive damages as stated under the prayer for relief.

**Count III**

    **3.1   Deprivation of due process in violation of U.S Constitution, Fifth Amendment**

    **3.2   Deprivation of due process in violation of Article I, § 11 of The Constitution of the State of New York**

    **3.3   Deprivation of due process in violation of Article I, § 2 of The Constitution of the State of Louisiana**

**Defendants: Unknown federal agents, and John Doe 1**

267) Plaintiff incorporates by reference the assertions contained in Paragraphs 1 through 266, above, as if fully set forth in this section.

268) Plaintiff is a legal permanent resident within the jurisdiction of the United States.

**269)**    As an individual within the jurisdiction of the United States, and as a legal permanent resident, Plaintiff at all times relevant to this complaint was entitled to equal protection of the laws.

**270)**    At all times relevant to this complaint, Plaintiff had a Constitutional right to be free from unwarranted violations of Plaintiff's procedural and substantive due process right under the Fifth Amendment to the Constitution of the United States.

**271)**    Defendants, acting under the scope of their federal employment, violated Plaintiff's Constitutionally protected right.

**272)**    On or around April 2020 Defendants, acting under color of federal law, engaged in tracking, following, and surveilling Plaintiff.

**273)**    On 5/21/2021 Plaintiff's petition for permanent residence was approved by the United States Citizenship and Immigration Services (USCIS).

**274)**    On or around 5/21/2021 Defendants conspired to deprive Plaintiff of benefits, privileges, and responsibilities of permanent residence by continuing to harass Plaintiff in order to run Plaintiff out of the country.

**275)**    Defendants became excessively fixated on creating hostile environments for Plaintiff, designed to deprive Plaintiff both substantive and procedural due process in order to run Plaintiff out of the country.

**276)**    Defendants had no probable cause to violate Plaintiff's due process right for a protracted period from May 2021 to September 2022.

**277)**    There is no statutory cause of action that can provide Plaintiff a meaningful remedy for Defendants' continued violations of Plaintiff's due process right, and equal protection of the

laws implied in the Equal Protection Clause of the Fifth Amendment to the Constitution of the United States.

278)    An appropriate remedy, namely damages, can be imposed. Plaintiff seeks compensatory and punitive damages as stated under the prayer for relief.

**Count IV**

> **4.1    Deprivation of equal protection of the laws in violation of the Equal Protection Clause of U.S Constitution, Fifth Amendment**
>
> **4.2    Deprivation of equal protection of the laws in violation of the Equal Protection Clause of Article I, § 11 of The Constitution of the State of New York**
>
> **4.3    Deprivation of equal protection of the laws in violation of the Equal Protection Clause of Article I, § 2 of The Constitution of the State of Louisiana**

**Defendants: Unknown federal agents, and John Doe 1**

279)    Plaintiff incorporates by reference the assertions contained in Paragraphs 1 through 278, above, as if fully set forth in this section.

280)    Plaintiff is a legal permanent resident within the jurisdiction of the United States.

281)    As an individual within the jurisdiction of the United States, and as a legal permanent resident, Plaintiff at all times relevant to this complaint was entitled to equal protection of the laws.

282)    At all times relevant to this complaint, Plaintiff had a Constitutional right to be free from unwarranted violations of the Equal Protection Clause of the Fifth Amendment to the Constitution of the United States.

283)    Defendants, acting under the scope of their federal employment, violated Plaintiff's Constitutionally protected right.

284)     On 5/21/2021 Plaintiff's petition for permanent residence was approved by the United States Citizenship and Immigration Services (USCIS).

285)     On or around 5/21/2021 Defendants conspired to deprive Plaintiff of benefits, privileges, and responsibilities of permanent residence, including equal protection of the laws, by continuing to harass Plaintiff in order to run Plaintiff out of the country.

286)     Defendants became excessively fixated on creating hostile environments for Plaintiff, designed to deprive Plaintiff equal protection of the laws in order to run Plaintiff out of the country.

287)     Defendants had no probable cause to violate Plaintiff's right of equal protection of the laws for a protracted period from May 2021 to September 2022.

288)     There is no statutory cause of action that can provide Plaintiff a meaningful remedy for Defendants' continued violations of Plaintiff's right to equal protection of the laws implied in the Equal Protection Clause of the Fifth Amendment to the Constitution of the United States.

289)     An appropriate remedy, namely damages, can be imposed. Plaintiff seeks compensatory and punitive damages as stated under the prayer for relief.


**Count V**

    **5.1**   **Cruel and unusual punishments in violation of U.S Constitution, Eighth Amendment**

    **5.2**   **Cruel and unusual punishments in violation of Article I, § 5 of The Constitution of the State of New York**

    **5.3**   **Cruel and unusual punishment in violation of Article I, § 20 of The Constitution of the State of Louisiana**

**Defendants: Unknown federal agents, and John Doe 1**

**290)**    Plaintiff incorporates by reference the assertions contained in Paragraphs 1 through 289, above, as if fully set forth in this section.

**291)**    Plaintiff is a legal permanent resident within the jurisdiction of the United States.

**292)**    As an individual within the jurisdiction of the United States, and as a legal permanent resident, Plaintiff at all times relevant to this complaint was entitled to equal protection of the laws.

**293)**    At all times relevant to this complaint, Plaintiff had a Constitutional right to be free from cruel and unusual punishments under the Eighth Amendment to the Constitution of the United States.

**294)**    Defendants, acting under color of law, violated Plaintiff's Constitutionally protected right.

**295)**    On 5/21/2021, Plaintiff's petition for permanent residence was approved by the United States Citizenship and Immigration Services (USCIS).

**296)**    On or around August 2021 Plaintiff would have reasonable cause to believe Defendants used through-the-wall x-ray surveillance equipment, and possibly aerial surveillance to target Plaintiff with concentrated ionizing radiation in order to cause substantial pain, discomfort, and humiliation to Plaintiff, for the purposes of creating hostile living environments in order to run Plaintiff out of the country.

**297)**    Defendants have, under color of law, continued to use such cruel, unusual and inhumane methods, designed to deprive Plaintiff his right to be free from cruel and unusual punishments under the Eighth Amendment to the Constitution of the United States.

**298)**    From around August 2021 to September 2022, Defendants have continually targeted Plaintiff with concentrated ionizing radiation, such that Plaintiff has been left with nowhere to go for safety.

**299)**    Defendants had no probable, legal, moral, or ethical cause to subject Plaintiff to cruel, unusual, and inhumane methods of enforcement. Additionally, Defendants lacked probable cause to subject Plaintiff to cruel, unusual, and inhumane conditions after Plaintiff was granted permanent residence on 5/21/2021.

**300)**    There is no statutory cause of action that can provide Plaintiff a meaningful remedy for Defendants' continued violations of Plaintiff's Constitutionally protected right to be free from cruel and unusual punishments.

**301)**    An appropriate remedy, namely damages, can be imposed. Plaintiff seeks compensatory and punitive damages as stated under the prayer for relief.

## **STATUTORY**

**Count VI**

> **6.1    Substantial impairment of equal rights under the law in violation of 42 U.S.C. § 1981(a) et seq**

**Defendant: John Doe 2, Jane Doe 1, John Doe 4, John Doe 5, and Neal Maroney**

**302)**    Plaintiff incorporates by reference the assertions contained in Paragraphs 1 through 301, above, as if fully set forth in this section.

**303)**    Plaintiff is a legal permanent resident within the jurisdiction of the United States.

**304)**    As an individual within the jurisdiction of the United States, and as a legal permanent resident, Plaintiff at all times relevant to this complaint was entitled to equal protection of the laws.

**305)**    At all times relevant to this complaint, Plaintiff had a statutory right to be free from nongovernmental discrimination and discrimination under state color of law.

306)    From around April 2020 to September 2022, Defendants John Doe 2 and Jane Doe 1 tracked, followed, surveilled, and harassed Plaintiff, including but not limited to casting aspersions about Plaintiff that they caught Plaintiff, Plaintiff was a criminal and that Plaintiff was getting deported (Paragraphs 53 through 234).

307)    The expectation that Plaintiff was getting deported, caused Defendants John Doe 2 and Jane Doe 1 to treat Plaintiff disparately based on national origin.

308)    Defendants John Doe 2 and Jane Doe 1 intentionally engaged in discriminatory practices, against Plaintiff, with malice and/or reckless indifference to the federally protected rights of Plaintiff.

309)    Defendants John Doe 2 and Jane Doe 1's actions were a direct and proximate cause of Plaintiff's impaired right of equal rights under the law, including the consequential harassment and violence Plaintiff endured from around April 2020 to September 2022.

310)    From around July 2021, Defendants John Doe 4 and John Doe 5 were made aware by Plaintiff of violations of Plaintiff's federally protected rights on university grounds.

311)    Defendants John Doe 4 and John Doe 5 knew or reasonably should have known about violations of Plaintiff's federally protected rights on university grounds (Paragraphs 84 through 148).

312)    The expectation that Plaintiff was getting deported, caused Defendants John Doe 4 and John Doe 5 to treat Plaintiff disparately based on national origin.

313)    Defendants John Doe 4 and John Doe 5 acted in deliberate ignorance when defendants, among other things, failed to provide Plaintiff a police report alleging violations of Plaintiff's civil and Constitutional rights while on the premises of the university (Paragraphs 103 through 110).

314) Defendants John Doe 4 and John Doe 5 intentionally engaged in discriminatory practices, against Plaintiff, with malice and/or reckless indifference to the federally protected rights of Plaintiff (Paragraphs 103 through 110).

315) Defendants John Doe 4 and John Doe 5's actions under state color of law were a direct and proximate cause of Plaintiff's impaired right of equal rights under the law, including the consequential harassment and violence Plaintiff endured while at the university from around July 2021 to November 2021.

316) From Around August 2021 to November 2021, Defendant Neal Maroney, on several occasions engaged in language toward Plaintiff that created a hostile learning environment for Plaintiff in the classroom (Paragraphs 122 through 136)

317) The expectation that Plaintiff was getting deported caused Defendant Neal Maroney to treat Plaintiff disparately based on national origin.

318) Defendant Neal Maroney acted in deliberate ignorance and reckless indifference to the federally protected rights of Plaintiff.

319) Defendant Neal Maroney's actions were a direct and proximate cause of Plaintiff's impaired right of equal rights under the law, including the consequential hostile learning environment Plaintiff endured in his class while at the university from around August 2021 to November 2021.

320) Plaintiff seeks relief as stated under the prayer for relief.

**Count VII**

**7.1    Substantial interference with the ability to make and enforce contracts in violation of 42 U.S.C. § 1981(a) et seq**

**Defendant: John Doe 2, John Doe 3, Jane Doe 1, John Doe 4, John Doe 5, and Neal Maroney**

321)    Plaintiff incorporates by reference the assertions contained in Paragraphs 1 through 320, above, as if fully set forth in this section.

322)    Plaintiff is a legal permanent resident within the jurisdiction of the United States.

323)    As an individual within the jurisdiction of the United States, and as a legal permanent resident, Plaintiff at all times relevant to this complaint was entitled to equal protection of the laws, including the right to make and enforce contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

324)    At all times relevant to this complaint, Plaintiff had a statutory right to be free from nongovernmental discrimination and discrimination under state color of law.

325)    From around April 2020 to September 2022, Defendants John Doe 2 and Jane Doe 1 tracked, followed, surveilled, and harassed Plaintiff, including but not limited to casting aspersions about Plaintiff that they caught Plaintiff, Plaintiff was a criminal and that Plaintiff was getting deported (Paragraphs 53 through 234).

326)    The expectation that Plaintiff was getting deported, caused Defendants John Doe 2 and Jane Doe 1 to treat Plaintiff disparately based on national origin.

327)    Defendants John Doe 2 and Jane Doe 1 intentionally engaged in discriminatory practices, against Plaintiff, with malice and/or reckless indifference to the federally protected rights of Plaintiff.

328)    Defendants John Doe 2 and Jane Doe 1's actions were a direct and proximate cause of Plaintiff's impaired right to make and enforce contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, from around April 2020 to

September 2022. Which caused Plaintiff to break several leases, withdraw from the University of New Orleans, and endure substantial emotional and socioeconomic distress.

329)    From around July 2021, Defendants John Doe 4 and John Doe 5 were made aware by Plaintiff of violations of Plaintiff's federally protected rights on university grounds.

330)    Defendants John Doe 4 and John Doe 5 knew or reasonably should have known about violations of Plaintiff's federally protected rights on university grounds (Paragraphs 84 through 148).

331)    The expectation that Plaintiff was getting deported, caused Defendants John Doe 4 and John Doe 5 to treat Plaintiff disparately based on national origin.

332)    Defendants John Doe 4 and John Doe 5 acted in deliberate ignorance when defendants, among other things, failed to provide Plaintiff a police report alleging violations of Plaintiff's civil and Constitutional rights while on the premises of the university (Paragraphs 103 through 110).

333)    Defendants John Doe 4 and John Doe 5 intentionally engaged in discriminatory practices, against Plaintiff, with malice and/or reckless indifference to the federally protected rights of Plaintiff (Paragraphs 103 through 110).

334)    Defendants John Doe 4 and John Doe 5's actions under state color of law were a direct and proximate cause of Plaintiff's impaired right to make and enforce contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, from around July 2021 to November 2021. Which caused Plaintiff to break his lease with university housing, withdraw from the University of New Orleans, and endure substantial emotional and socioeconomic distress.

**335)**   From Around August 2021 to November 2021, Defendant Neal Maroney, occasionally engaged in language toward Plaintiff that created a hostile learning environment for Plaintiff in the classroom (Paragraphs 121 through 137).

**336)**   The expectation that Plaintiff was getting deported caused Defendant Neal Maroney to treat Plaintiff disparately based on national origin.

**337)**   Defendant Neal Maroney acted in deliberate ignorance and reckless indifference to the federally protected rights of Plaintiff.

**338)**   Defendant Neal Maroney's actions were a direct and proximate cause of Plaintiff's impaired right to make and enforce contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, from around August 2021 to November 2021. Which caused Plaintiff to break his lease with university housing, withdraw from the University of New Orleans, and endure substantial emotional and socioeconomic distress.

**339)**   Plaintiff seeks relief as stated under the prayer for relief.

**Count VIII**

   **8.1   Deprivation of rights in violation of 42 U.S.C. § 1983**

**Defendant: John Doe 2, Jane Doe 1, John Doe 4, John Doe 5, Neal Maroney, and University of New Orleans**

**340)**   Plaintiff incorporates by reference the assertions contained in Paragraphs 1 through 339, above, as if fully set forth in this section.

**341)**   Plaintiff is a legal permanent resident within the jurisdiction of the United States.

**342)**   As an individual within the jurisdiction of the United States, and as a legal permanent resident, Plaintiff at all times relevant to this complaint was entitled to equal protection of the

laws, including the right to be free from arbitrary and unreasonable deprivation of civil and Constitutional rights.

343)   At all times relevant to this complaint, Plaintiff had a statutory right to be free from nongovernmental discrimination and discrimination under state color of law.

344)   From around April 2020 to September 2022, Defendants John Doe 2 and Jane Doe 1 tracked, followed, surveilled, and harassed Plaintiff, including but not limited to casting aspersions about Plaintiff that they caught Plaintiff, Plaintiff was a criminal and that Plaintiff was getting deported (Paragraphs 53 through 234).

345)   The expectation that Plaintiff was getting deported, caused Defendants John Doe 2 and Jane Doe 1 to treat Plaintiff disparately based on national origin.

346)   Defendants John Doe 2 and Jane Doe 1 intentionally engaged in discriminatory practices, against Plaintiff, with malice and/or reckless indifference to the federally protected rights of Plaintiff.

347)   Defendants John Doe 2 and Jane Doe 1's actions were a direct and proximate cause of subjecting, or causing Plaintiff to be subjected to the deprivation of rights, privileges, or immunities secured by the Constitution and the laws, from around April 2020 to September 2022. Which caused Plaintiff to endure substantial emotional and socioeconomic distress.

348)   From around July 2021, Defendants John Doe 4 and John Doe 5 were made aware by Plaintiff of violations of Plaintiff's federally protected rights on university grounds.

349)   Defendants John Doe 4 and John Doe 5 knew or reasonably should have known about violations of Plaintiff's federally protected rights on university grounds (Paragraphs 84 through 148).

350)    The expectation that Plaintiff was getting deported, caused Defendants John Doe 4 and John Doe 5 to treat Plaintiff disparately based on national origin.

351)    Defendants John Doe 4 and John Doe 5 acted in deliberate ignorance when defendants, among other things, failed to provide Plaintiff a police report alleging violations of Plaintiff's civil and Constitutional rights while on the premises of the university (Paragraphs 103 through 110).

352)    Defendants John Doe 4 and John Doe 5 intentionally engaged in discriminatory practices, against Plaintiff, with malice and/or reckless indifference to the federally protected rights of Plaintiff (Paragraphs 103 through 110).

353)    Defendants John Doe 4 and John Doe 5's actions under state color of law were a direct and proximate cause of subjecting, or causing Plaintiff to be subjected to the deprivation of rights, privileges, or immunities secured by the Constitution and the laws, from around July 2021 to November 2021. Which caused Plaintiff to endure substantial emotional and socioeconomic distress.

354)    From Around August 2021 to November 2021, Defendant Neal Maroney occasionally engaged in language toward Plaintiff that created a hostile learning environment for Plaintiff in the classroom (Paragraphs 122 through 136)

355)    The expectation that Plaintiff was getting deported caused Defendant Neal Maroney to treat Plaintiff disparately based on national origin.

356)    Defendant Neal Maroney acted in deliberate ignorance and reckless indifference to the federally protected rights of Plaintiff.

357)    Defendant Neal Maroney's actions were a direct and proximate cause of subjecting, or causing Plaintiff to be subjected to the deprivation of rights, privileges, or immunities secured

by the Constitution and the laws, from around August 2021 to November 2021. Which caused Plaintiff to endure substantial emotional and socioeconomic distress.

358)     Defendant University of New Orleans knew or reasonably should have known about violations of Plaintiff's federally protected rights on university grounds (Paragraphs 84 through 148).

359)     Defendant University of New Orleans owed Plaintiff a duty of care or reasonable duty of care against deprivation of Plaintiff's statutory and constitutionally protected rights on university premises, while Plaintiff resided and was enrolled as a student at the university.

360)     Defendant University of New Orleans breached that duty when Defendant University of New Orleans acted with deliberate indifference to the discrimination, harassment, and violence Plaintiff endured while living and enrolled as a student at the university.

361)     Defendant University of New Orlean's negligence was a direct and proximate cause of subjecting, or causing Plaintiff to be subjected to the deprivation of rights, privileges, or immunities secured by the Constitution and the laws, from around July 2021 to November 2021. Which caused Plaintiff to endure substantial emotional and socioeconomic distress.

362)     Plaintiff seeks relief as stated under the prayer for relief.


## Count IX

### 9.1    Conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985(2)

**Defendant: John Doe 1, John Doe 2, and Jane Doe 1**

363)     Plaintiff incorporates by reference the assertions contained in Paragraphs 1 through 362, above, as if fully set forth in this section.

364)     Plaintiff is a legal permanent resident within the jurisdiction of the United States.

**365)**    As an individual within the jurisdiction of the United States, and as a legal permanent resident, Plaintiff at all times relevant to this complaint was entitled to equal protection of the laws, including the right to be free from arbitrary and unreasonable deprivation of civil and Constitutional rights.

**366)**    At all times relevant to this complaint, Plaintiff had a statutory right to be free from nongovernmental discrimination and discrimination under state color of law.

**367)**    From around May 2022, Defendants John Doe 1, John Doe 2, and Jane Doe 1 conspired to impede, hinder, obstruct, or defeat the due course of justice, with intent to deny Plaintiff the equal protection of the laws, or to injure Plaintiff for lawfully enforcing or attempting to enforce the right to equal protection of the laws, when they targeted Plaintiff with ionizing radiation to prevent or diminish Plaintiff's ability to seek justice from the Court (Paragraph 234 item #14).

**368)**    Plaintiff seeks relief as stated under the prayer for relief.


**Count X**

    **10.1  Conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985(3)**

**Defendant: John Doe 1, John Doe 2, Jane Doe 1, John Doe 4, John Doe 5, John Doe 6, and Susan Brady**

**369)**    Plaintiff incorporates by reference the assertions contained in Paragraphs 1 through 368, above, as if fully set forth in this section.

**370)**    Plaintiff is a legal permanent resident within the jurisdiction of the United States.

**371)**    As an individual within the jurisdiction of the United States, and as a legal permanent resident, Plaintiff at all times relevant to this complaint was entitled to equal protection of the

laws, including the right to be free from arbitrary and unreasonable deprivation of civil and Constitutional rights.

372)    At all times relevant to this complaint, Plaintiff had a statutory right to be free from nongovernmental discrimination and discrimination under state color of law.

373)    From around April 2020 to September 2022, Defendants John Doe 1, John Doe 2, and Jane Doe 1 tracked and followed Plaintiff, on the highway and on the premises of another for the purpose of depriving, either directly or indirectly Plaintiff the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities in the States of New York and Louisiana, from giving or securing to Plaintiff the equal protection of the laws, when Defendants abused civil processes, including color of law to allege that Plaintiff was getting deported even after Plaintiff's petition for permanent residence was approved, including to harass, and severely demonize and defame Plaintiff in order to intimidate Plaintiff to leave the country.

374)    Defendants John Doe 4 and John Doe 5 knew or reasonably should have known about the conspiracy to violate Plaintiff's federally protected rights on university grounds, in order to constructively remove Plaintiff from his university apartment and academic program (See Paragraph 104).

375)    Defendants John Doe 6 conspired with Defendants John Doe 1, John Doe 2, and Jane Doe 1 when Defendant violated Plaintiff's right to privacy as stated in Paragraphs 201 through 204.

376)    Defendant Susan Brady conspired with Defendants John Doe 1, John Doe 2, and Jane Doe 1 by negligently making a false diagnosis that Plaintiff had schizophrenia in order to 1) discredit Plaintiff's allegations of being tracked, followed, surveilled, and harassed by Defendants John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, and their proxies,

and 2) manufacture aggravating factors that could reasonably have a negative influence on a future benefit that Plaintiff would otherwise qualify for (adjusting to citizenship). See Paragraphs 190 through 200.

**377)**    Defendants' actions, severely interfered with Plaintiff's ability to exercise his civil and Constitutional rights, causing Plaintiff to experience daily excruciating physical pain, including but not limited to substantial emotional and socioeconomic distress, from Plaintiff being subjected to cruel, unusual, and inhumane methods of enforcement.

**378)**    Plaintiff seeks relief as stated under the prayer for relief.


**Count XI**

### 11.1    Failure to prevent in violation of 42 U.S.C. § 1986

**Defendants: John Doe 1, Unknown federal agents, John Doe 2, Jane Doe 1, John Doe 3, John Doe 4, John Doe 5, Neal Maroney, University of New Orleans, John Doe 6, and Susan Brady**

**379)**    Plaintiff incorporates by reference the assertions contained in Paragraphs 1 through 378, above, as if fully set forth in this section.

**380)**    Plaintiff is a legal permanent resident within the jurisdiction of the United States.

**381)**    As an individual within the jurisdiction of the United States, and as a legal permanent resident, Plaintiff at all times relevant to this complaint was entitled to equal protection of the laws, including the right to be free from arbitrary and unreasonable deprivation of civil and Constitutional rights.

**382)**    At all times relevant to this complaint, Plaintiff had a statutory right to be free from nongovernmental discrimination and discrimination under state color of law.

383)    Defendants, having knowledge of the conspiracies and wrong acts towards Plaintiff, had power to prevent, or aid in preventing the commission of the violations.

384)    Defendants' actions to neglect or refuse to prevent or aid in preventing the wrongful acts, severely restricted Plaintiff's ability to exercise his civil and Constitutional rights. And caused Plaintiff to suffer substantial physical pain, emotional and socioeconomic distress, from Plaintiff being subjected to cruel, unusual, and inhumane methods of enforcement.

385)    Plaintiff seeks relief as stated under the prayer for relief.

## DECLARATORY RELIEF

386)    A present and actual controversy exists, between Plaintiff and Defendant the University of New Orleans. As a consequence of Plaintiff withdrawing from the University, due to the allegations in Paragraphs 84 through 148, Plaintiff was charged an outstanding balance in the amount of $3235 for the remainder of Plaintiff's university apartment lease. Plaintiff did not have to withdraw, but was constructively made to do so. Plaintiff seeks declaratory relief from the Court regarding the matter of the outstanding balance.

## INJUCTIVE RELIEF

387)    No plain, adequate, or complete remedy at law is available to Plaintiff, to redress the wrongs suffered by Plaintiff.

388)    The use of ionizing radiation causes Plaintiff excruciating pain, and discomfort in the moment that it happens. This method of enforcement also creates and exacerbates the risks of future health complications, such as cancer (Exhibits 11A, 11B 12A, 12B, 13 and 14). Plaintiff seeks injunctive relief from the Court to compel the government agency or agencies, using such methods on Plaintiff to refrain from such activities and instead engage in fair and humane civil processes for their allegations against Plaintiff.

389)    Plaintiff seeks injunctive relief from the Court to compel Defendants to refrain from conduct depriving Plaintiff equal protection of the laws, and interfering with Plaintiff's ability to make socioeconomic progress.

390)    While injunctive relief does not cure the injuries already suffered by Plaintiff, it prevents, or substantially mitigates the continued and escalating violations of Plaintiff's Constitutionally protected rights. If this Court does not grant the injunctive relief sought in this Pleading, Plaintiff fears he will be irreparably harmed by the conduct of Defendants, who have shown a willingness to disregard the laws and use cruel, unusual, and inhumane methods to force Plaintiff out of the country.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. For the Court to assume jurisdiction over this matter.

2. For permanent injunctive relief as stated in Paragraphs 387 through 390.

3. For a total of $215,249 in compensatory damages divided equally among Defendants John Doe 1, Unknow federal agents, John Doe 2, and jane Doe 1.

4. For punitive damages from Defendants John Doe 1, Unknown federal agents, John Doe 2, and Jane Doe 1 in an amount to be determined at trial.

5. For damages to compensate for Plaintiff's emotional distress, from Defendants John Doe 3, John Doe 6, and Susan Brady in an amount to be determined at trial.

6. For punitive damages from Defendants John Doe 3, John Doe 6, and Susan Brady in an amount to be determined at trial.

7.  For a total of $8,022 in liquidated damages paid to Defendant the University of New

    Orleans, for the school term Fall 2021; divided equally among Defendants John Doe 4,

    John Doe 5, Neal Maroney, and the University of New Orleans.

8.  For punitive damages from Defendants John Doe 4, John Doe 5, and Neal Maroney in an

    amount to be determined at trial.

9.  For reasonable litigation expenses accrued to Plaintiff pursuant to 42 U.S.C. § 1988 on all

    claims allowed by the laws.

10. For restraining orders, if that was in this court's jurisdiction, and if this court determines

    that justice so requires, to restrain the illegal vigilante violence of private individuals

    working alongside government agents.

11. For de novo review of Plaintiff's permanent residence pursuant to 5 U.S.C. § 702, to

    settle the matter of Plaintiff's permanent residence.

12. In *Kyllo v. United States* (2001), a little over 20 years ago, the Supreme Court considered

    the issue of sophisticated methods of surveillance[7] "through-the-wall" technologies. In

    Footnote 3 of this Pleading, Justice Scalia gave examples of such sophisticated

    technologies; at one point mentioning that, "Some devices may emit **low levels of**

    **radiation** that travel "through-the-wall,"" [Emphasis added]. That was about 20 years ago;

    it is not a stretch to ruminate that the technology 20 years later has advanced and can emit

---

[7] Justice Scalia delivering the opinion of the court mentioned, "While the technology used in the present case was relatively crude, the rule we adopt must take account of more sophisticated systems that are already in use or in development."

high and/or concentrated levels of radiation or energy that could potentially be harmful to an individual's health (Exhibits 11A, 11B, 12A, 12B, 13 and 14). In this pleading, I have alleged being targeted by unknown federal agents using ionizing radiation, to create environments so hostile and pervasive in order to force me to leave the country. From the nascence of such targeting, which was around August 2021, I have tried to document every instance of it – it has happened every day, several times a day, since then. With a pattern of being extremely severe in places such as libraries or classrooms, perhaps as a way to try to prevent or diminish my ability to help myself. I have observed that the individuals around my immediate community have witnessed this, but for some reason will not speak up against it. From observation, I have come to understand that people witnessing this are more fascinated at the capabilities of the technologies, before they can conceive of any legal, moral, ethical, or health issues with the use of such technologies; especially Constitutional implications for the immigrant community, from the real possibility of the government using such furtive methods to forcibly remove immigrants from the country without proper due process. I don't know that anyone comes to the United States to experience such violence, partly sponsored by the government. It has felt like trappings of entrapment, or the making of a malicious prosecution case. As an academic, I have tried to understand this experience, and by understanding the little bit I have, over the 29 months this pursuit has been going on, including the government's use of what has felt to me as cruel, unusual, and inhumane methods of enforcement, I have observed federal authority being used to create an untrue narrative of mental illness, most likely intended to discredit the things I have come to understand regarding the government's ability and use of ionizing radiation as a method of enforcement. It is every day, several times a day, that I have to

experience excruciating pain, which has literally felt like death from a thousand cuts. I have asked for help, from anyone and everyone that I believed could help, but I am witnessing the government of the most powerful nation on earth, isolating me, and severely demonizing and defaming me to the extent that asking for help only seems to make things worse, because Defendants wielding federal authority have influenced just about everyone against me. And the perception of helplessness only seems to inspire subtle, and sometimes blatant, forms of discrimination from the community. I am praying for relief from the kinds of hostile environments, described in this pleading, created under color of law. Technology has a way of outpacing past precedents against violations of Constitutional liberties. It is the duty for the Court to close the gap. My experience in this pleading has shown me that there is no life, liberty, or pursuit of happiness, without Constitutional protections. I have never, at any time in my life, been so grateful at the idea of a divided government, and of the separation of powers. If the independent tribunals of the justice system ignore these prayers for relief, I don't see how, as a quotidian academic, I survive the experiences described in this pleading.

13. Plaintiff prays for such other and further relief as this Court deems just and proper.


Dated:  September 10, 2022                        Respectfully submitted,

                                                  JOSHUA MUZUMALA

                                                  **/s/ Joshua Muzumala**

                                                  _____


                                        E-mail:        jmuz360@outlook.com
                                        Telephone:     (929) 404-4706